ERIC LAMONT COLEMAN, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 23963

May 25, 1995                                                    895 P.2d 653

[Rehearing denied October 19, 1995]

*Morgan D. Harris,* Public Defender and *Robert L. Miller,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney and *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

---

[10]THE HONORABLE CLIFF YOUNG, Justice, voluntarily recused himself from participation in the decision of this appeal.

## OPINION

By the Court, ROSE, J.:

Appellant Eric Lamont Coleman (Coleman) was convicted of one count of robbery with use of a deadly weapon, and acquitted of one count of attempted murder with use of a deadly weapon. Coleman asserts that the prosecutor's questions during cross-examination constituted impermissible comment on his silence for impeachment purposes, violating his Fifth Amendment right against self incrimination and his Fourteenth Amendment due process right to a fair trial. We agree that the references to Coleman's silence constituted prosecutorial misconduct, but for reasons stated below, we affirm Coleman's conviction.

### FACTS

Appellant Coleman was charged with one count of attempted murder with use of a deadly weapon and one count of robbery with use of a deadly weapon.

At trial Jose Martinez (Martinez), the victim, testified to the events of December 22, 1991, as follows. At approximately 8:00 p.m., he went to the Blockbuster Video store on Carey and Lake Mead in North Las Vegas to rent video movies. Upon leaving the store and walking to his car, Martinez was approached by

Coleman, who was wearing a black jacket and a dark colored ski mask. Coleman pointed a gun at him, said "give me your keys," then snatched the keys from Martinez. As Coleman attempted to unlock the car door, Martinez stepped forward and Coleman yelled, "Get back or I'll shoot." Martinez continued to walk towards Coleman to prevent him from taking his car. Unable to unlock the driver's door, Coleman went around and attempted to open the passenger door, while Martinez struggled with the driver's door. When Martinez finally got the door to open, he reached under the seat to retrieve his .45 semiautomatic weapon.[1] As Martinez was cocking his gun, an unidentified man came from the left and brandished a 40-ounce bottle at Martinez while shouting, "He's got a gat."

According to Martinez, Coleman then fired two rounds at him. Martinez immediately fired three times in Coleman's direction, then took cover behind the left rear tire of his car. The other man hurled the bottle at Martinez, striking him in the elbow. Not knowing whether or not the unidentified assailant had a gun, Martinez then fired three shots at him. This unidentified man ran around the corner of the store while Coleman lay wounded on the ground beside Martinez's car. Martinez ran after the unidentified man and when he could no longer observe him, returned to Blockbuster and told them to call the police.[2]

While waiting for the police to arrive, Martinez noticed that he had been wounded in the left hand and in the right upper chest area. Martinez retrieved his keys from Coleman and drove himself to Lake Mead Hospital, one block away from the scene. At the hospital, Martinez was treated for a gunshot wound to the left hand and a laceration to the right pectoral area.

Robert Windham (Windham), a patrol officer with the North Las Vegas Police Department testified that he arrived at the scene and sealed off the area. He observed a 40-ounce malt liquor bottle lying on the ground, and also saw Coleman kneeling in the parking lot in a pool of blood—bleeding profusely from wounds to the right cheek and left ear. Emergency personnel subsequently transported Coleman to University Medical Center (UMC).

Windham further testified that when he arrived at UMC after driving there directly from the crime scene, he discovered that Coleman's fiancee and sister were already there. When he asked

---

[1]Martinez testified that he carried this weapon for protection from drug dealers in his neighborhood.

[2]A Blockbuster employee, who stated that he had helped Martinez pick out three videos earlier that evening, testified that Martinez reentered Blockbuster and told employees to call the police.

Coleman's fiancee, Davonna, how she knew that Coleman had been hurt, she responded that a man named Alex had driven to her house, informed her that Coleman had been shot, and then proceeded to drive her to UMC. Davonna did not know Alex's last name, but told Windham that she and Coleman had been at her sister's house earlier that evening with Alex. Coleman had taken her back home, dropped her off, and left the house with Alex around 7:30 p.m.

At trial, Davonna testified that she told Windham that Coleman had left the house after dinner by himself, not with Alex. She further testified that she told Windham that she knew Coleman was in the hospital because her friend Charlotte, who was at the hospital, called her and told her Coleman had been brought in. Davonna also stated that she drove her own car to the hospital.

Robert Amundsen (Amundsen), an identification technician with the North Las Vegas Police Department for over sixteen years, testified that he arrived at the shooting scene at approximately 9:00 p.m. He recovered bloody clothes and a ski mask from the parking lot. The ski mask was wet and blood soaked, and appeared to contain bullet holes in the areas of the right cheek and left ear.

Coleman took the stand and testified to a completely different version of the events than the one testified to by Martinez. He stated that he went to Blockbuster to purchase marijuana from Martinez, with whom he had dealt before. Coleman stated that when Martinez came out of the store, Coleman approached him in the parking lot. Martinez handed Coleman the marijuana and Coleman gave him fifty dollars. Coleman then weighed the marijuana on a small hand-held scale, discovering that the required amount was deficient. He demanded the return of his money. Martinez turned back towards the car and Coleman thought he was going to get more marijuana, but instead, Martinez got his gun and started shooting at Coleman. Coleman hit the ground, crawled to his car, and grabbed his weapon from the car. As soon as he stood up, Martinez shot him. Coleman testified that he did not know what happened after that, and could not remember if he shot Martinez or not. Additionally, Coleman testified that he was not wearing the ski mask as Martinez alleged, but that it was inside his jacket pocket.

On cross-examination, Coleman further testified that he was at his home with his fiancee all day until approximately 7:00 p.m., when he left the house by himself and went to McNeal's bar. Coleman testified that he knew nothing about the man named Alex, whom Davonna had described to Windham the night of the incident. He also stated that the hand-held scale that he had used to weigh the marijuana had disappeared. The prosecutor ques-

tioned Coleman about whether, in the nine months following his arrest, Coleman had ever told the police about the scale.[3] During his closing argument, the prosecutor again referred to Coleman's failure to give his version of events prior to trial.[4]

The jury returned a verdict of guilty on the charge of robbery with use of a deadly weapon and not guilty on the charge of attempted murder with use of a deadly weapon. The court sentenced Coleman to a term of four-and-a-half years with an additional consecutive term of four years for use of a deadly weapon, and ordered him to pay $1,180 in restitution.

Coleman appeals, asserting that the prosecutor's questions during cross-examination constituted impermissible use of his silence for impeachment purposes, violating his Fifth Amendment right against self incrimination and his Fourteenth Amendment due process right to a fair trial.

### DISCUSSION

The State argues that appellant should be barred from raising the issue of prosecutorial misconduct during cross-examination

---

[3]The exchange was as follows:

Q Tell me something. There's been about nine months that have passed now, and this is the first time we're hearing anything about this scale.
A Uh-huh.
Q Did you ever think to tell the officers about this scale?
A Okay. For one thing---
Q Did you tell the officers about the scale?
A Can I explain first?
Q Yes or No.
A No, but can I explain?
Q Was there a preliminary hearing in this matter?
A Yes, it was.
Q And at that point in time, did the police show up?
A Yes.
Q And at that point in time, did you ever tell the police about that scale?
A My public defender didn't want my [sic] to say nothing.

[4]During his closing argument, the prosecutor stated:

The defendant told you that he was at home all day long with his wife or his fiancee, I believe he said; that no one else ever came around. That's his theory. He's had nine months to think about what his theory would be and what might fly with this jury.

Davonna didn't have nine months to think about what would fly, nor is she an attorney. She said, "Oh, yes, I saw Eric [Coleman] about" — well, it would have been about 45 minutes earlier. It was at 7:30. And he left with a couple of other black male adults and a guy named Alex.

Later in his closing argument, the prosecutor stated, "The defendant's story is self-serving. It is one that he's had nine months to think of and now delivers."

since he failed to object at trial.[5] However, this court may consider the issue *sua sponte*. *See* Emmons v. State, 107 Nev. 53, 61, 807 P.2d 718, 723 (1991) (this court may address plain error or issues of constitutional dimension *sua sponte*). Additionally, though appellant does not object on appeal to the prosecutor's comments during closing argument, we will also consider this issue *sua sponte*.

In Doyle v. Ohio, 429 U.S. 987 (1976), the United States Supreme Court held that the use for impeachment purposes of a defendant's silence at the time of arrest and after receiving *Miranda* warnings violates the Due Process Clause of the Fourteenth Amendment. In Fletcher v. Wier, 455 U.S. 603 (1982), the Court refused to extend the holding of *Doyle* to cover a case in which there was no evidence in the record indicating that the respondent received any *Miranda* warnings during the period in which he remained silent after his arrest, stating:

> In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

*Id.* at 607.

The record does not indicate that Coleman was ever given *Miranda* warnings.[6] We therefore conclude that Coleman did not receive his *Miranda* warnings. *See* People v. Delgado, 13 Cal. Rptr. 2d 703, 706 (Ct. App. 1992) (court found that because no evidence was adduced at trial that the defendant was questioned by officials, and because a defendant never questioned by officials need not be given his *Miranda* warnings, there was no basis to assume that the defendant was given his rights).

The State argues that in Nevada, the rule prohibiting a prosecu-

---

[5]After the exchange in question, defense counsel requested permission to approach the bench and a conference ensued; however, no objection or ruling is reflected in the record.

[6]There was no evidence introduced at trial regarding this issue. Coleman was not arrested on the night of the incident, as he was in the hospital in a coma for an unspecified time thereafter. A warrant was issued for Coleman's arrest on February 18, 1992. He was arrested on February 24, 1992, and booked into the Clark County Detention Center (two months and two days after the incident occurred). The record does not indicate that Coleman was ever questioned by the authorities while in custody.

tor's use of a defendant's silence to impeach him applies only to silence after the defendant has received his *Miranda* warnings, not merely to silence after arrest. We reject the State's argument. In the past we have chosen to exclude impeachment use of post-arrest silence without regard to whether or not *Miranda* warnings were given. *See* Murray v. State, 105 Nev. 579, 781 P.2d 288 (1989); McGee v. State, 102 Nev. 458, 725 P.2d 1215 (1986).

A number of policy considerations support our decision. First, the privilege against self-incrimination precludes reference to an arrestee's silence, so that the right to remain silent does not arise solely out of the express assurances contained in the *Miranda* warning. *See* People v. Free, 182 Cal. Rptr. 259, 264 (Ct. App. 1982).

Second, the *Miranda* warnings and an arrestee's right to remain silent have been widely publicized via the media, so that in many cases, the silence of an unwarned arrestee will be based on his personal knowledge of his *Miranda* rights; therefore, the "implicit assurance" of *Doyle* that his silence will not be used against him is inherently present.[7] *See* People v. Fondron, 204 Cal. Rptr. 457, 463 (Ct. App. 1984). A defendant's silence in such a case will not be highly probative. *See* United States v. Hale, 422 U.S. 171, 176 (1975) (noting that "[i]n most circumstances silence is so ambiguous that it is of little probative force," and stating that a variety of factors, e.g., intimidation by situation, fear, or unwillingness to incriminate another may cause the defendant to remain silent); *Fondron,* 204 Cal. Rptr. at 464 (the court concluded that "evidence of appellant's failure to make an exculpatory statement to the arresting officer was so ambiguous as to have little or no probative value and was greatly outweighed by its prejudicial effect"); *accord* People v. Conyers, 420 N.E.2d 933 (N.Y. 1981); People v. Quintana, 665 P.2d 605 (Colo. 1983).

Lastly, in refusing to draw a distinction between post-arrest, post-*Miranda* silence and post-arrest pre-*Miranda* silence, we foreclose any inducement to police to engage in gamesmanship—dispensing with a *Miranda* advisement where they suspect that the arrestee would refuse to talk anyway, or asking no questions immediately after the arrest in order to use a defendant's silence against him, but later giving a *Miranda* warning in order to secure a statement. *See Free,* 182 Cal. Rptr. at 264.[8]

---

[7]Additionally, many criminal defendants are repeat offenders who know that they have a right to remain silent from past experience.

[8]We are cognizant of the fact that the "California rule," forbidding cross-examination or commentary on a defendant's post-arrest silence whether *Miranda* warnings were given or not has been overruled by Proposition 8. *See* California People v. Delgado, 13 Cal. Rptr. 2d 703, 705 (Ct. App. 1992) ("[A]fter Proposition 8, evidence of appellant's pre-*Miranda* silence may be

Therefore, we conclude that use of a defendant's post-arrest silence for impeachment purposes may constitute prosecutorial misconduct whether or not the defendant received a *Miranda* warning.

The State asserts that because the evidence of Coleman's guilt was overwhelming in this case, the prosecutorial comment on Coleman's silence was harmless error. Error resulting from a prosecutor's improper references to the defendant's right to post-arrest silence must be harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967). We agree that the comments constituted harmless error for the following reasons.

First, this case is not one which rested solely on the defendant's word versus the victim's word: in such cases, we have found that a prosecutor's repeated references to the defendant's post-arrest silence constituted reversible error. *See* Murray v. State, 105 Nev. 579, 584-86, 781 P.2d 288, 291-92 (1989) (case rested solely on the alleged rape victim's word versus the defendant's word); Aesoph v. State, 102 Nev. 316, 721 P.2d 379 (1986) (main issue in the case was self-defense, there were no witnesses, and evidence was circumstantial).

In the instant case, the jury saw physical evidence and heard testimony corroborating Martinez's version of the events. Though Coleman denied that he was wearing the ski mask as Martinez alleged, Amundsen testified that when he found the ski mask at the crime scene it was wet and blood soaked, with what appeared to be bullet holes in the areas of the right cheek and the left ear. Coleman was shot in his right cheek and left ear. This mask was introduced into evidence for the jury's inspection.

Additionally, Coleman stated that he went to Blockbuster alone and had not heard of another man named Alex. Windham, however, testified that he observed a 40-ounce malt liquor bottle at the scene—corroborating Martinez's testimony that a second man was involved in the incident and threw a bottle at him. Moreover, Windham testified that on the night of the incident, Coleman's fiancee stated that Coleman had left the house with a man named Alex, and that Alex had picked her up and driven her to the hospital after informing her that Coleman had been shot—further corroborating Martinez's testimony that another man was

---

excluded only if application of the exclusionary rule is compelled by federal law.'') (quoting People v. O'Sullivan, 265 Cal. Rptr. 784 (Ct. App. 1990)). We believe that our conclusion today is not only permissible under federal law but also the appropriate result in interpreting the Nevada Constitution which also provides that ''[n]o person shall be . . . compelled, in any criminal case, to be a witness against himself.'' Nev. Const. art. 1, § 8.

involved in the incident. Officer Flaven, who interviewed Martinez at the hospital right after he was brought in, testified that Martinez's statement was consistent with his trial testimony.

Coleman, on the other hand, was unable to explain to the jury the disappearance of the marijuana, the fifty dollars, or the hand-held scale that he claimed were involved in the alleged drug transaction.

Additionally, we note that the frequency and intensity of the references to Coleman's silence are not of a nature requiring reversal. During cross-examination, the repetition of the questioning about the scale was largely a result of Coleman's evasiveness in answering the questions, rather than an attempt by the prosecutor to repeatedly draw the jury's attention to the fact that Coleman had failed to tell the police about the scale. Moreover, the prosecutor's questions referred only to Coleman's failure to mention the scale, not to Coleman's failure to tell police that he had gone to meet Martinez to buy drugs, and had shot Martinez in self-defense. *Cf.* Neal v. State, 106 Nev. 23, 787 P.2d 764 (1990). Coleman's statement that his public defender had told him not to say anything provided the jury with an explanation for his silence, thus helping to counteract any inference made by the prosecutor that Coleman's story was not believable.

Furthermore, we find that the prosecutor's first comment during closing argument, that Coleman "had nine months to think about what his theory would be," was not a blatant attempt to draw the jury's attention to Coleman's silence, but was a prelude to pointing out that Davonna's original statement to police corroborated Martinez's story. The comment that "[t]he defendant's story . . . is one that he's had nine months to think of and now delivers" was a passing reference made near the latter part of the prosecutor's argument, and followed by a run through of the strong corroborating evidence of Martinez's version of the events. We note that, in contrast to cases where we have found reversible error, the prosecutor did not imply that Coleman had fabricated his entire story while sitting in the courtroom listening to other witnesses testify. *See* Aesoph v. State, 102 Nev. 316, 721 P.2d 379 (1986).

Therefore, we conclude that Coleman's right to a fair and impartial trial was not violated. Accordingly, we affirm his conviction.

Young, Springer and Shearing, JJ., concur.

Steffen, C. J., concurring in part and dissenting in part:

I concur in affirming Coleman's judgment of conviction, but dissent from the majority's determination that the prosecutor impermissibly commented on Coleman's postarrest, pre-

*Miranda*-warning silence in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

It is unnecessary for my purposes to repeat the factual recital set forth in the majority opinion. I will therefore limit my dissent comments to the issue described above. I write separately on the issue because of its importance in promoting the search for truth.

In Doyle v. Ohio, 426 U.S. 610 (1976), the United States Supreme Court held that impeaching a defendant by reference to his or her postarrest, post-*Miranda*-warning silence constituted a violation of the defendant's due process rights under the Fourteenth Amendment. Here, there is no evidence in the record that Coleman received a postarrest *Miranda* warning, and there is no basis for assuming that he did. *See* People v. Delgado, 13 Cal. Rptr. 2d 703, 706 (Ct. App. 1992) (because of no trial evidence that defendant was questioned by officials, and because a defendant never questioned by officials need not be given his *Miranda* warnings, there was no basis for assuming that defendant was given his rights). It will thus be seen that *Doyle* is inapposite.

The *Doyle* rationale was based upon the ambiguous, equivocal nature of silence following the administration of *Miranda* warnings. The ambiguous nature of silence postdating the *Miranda* warnings stems from the prospect that the silence may be nothing more than an exercise of those rights, *Doyle,* 426 U.S. at 617 n.8, or the defendant's reaction to the substance of the warning that the arresting officer was required to give the arrestee. *Id.* at 617. In other words, inferences to be drawn from post-*Miranda* silence would at best be unreliable and therefore reference to such silence by a prosecutor for impeachment purposes would constitute a "deprivation of due process." *Id.* at 619. Of course, *Doyle* is not implicated in the instant case since there was no evidence that Coleman had received a *Miranda* warning prior to the postarrest silence at issue here. In addressing Coleman's appeal, the issues concerning the admissibility of a defendant's prewarning/postarrest silence for purposes of impeachment must be analyzed under the constitutional constraints of both the Fifth and Fourteenth Amendments.

*The admissibility of prewarning/postarrest silence under the Fifth Amendment.*

This issue questions whether a defendant's Fifth Amendment right not to be compelled to be a witness against himself or herself is violated by allowing a prosecutor to cross-examine a defendant on the subject of the defendant's prewarning/postarrest silence for impeachment purposes. An analysis of this question essentially implicates two issues. First, whether State action

compelled the defendant to incriminate himself or herself. Second, if there was such State action, whether it constituted an impermissible burden on the individual's privilege against self-incrimination.

The first issue has been addressed and resolved by the United States Supreme Court in Jenkins v. Anderson, 447 U.S. 231 (1980). The *Jenkins* Court rejected the suggestion in Bram v. United States, 168 U.S. 532 (1897), to the effect that, as related to the circumstances of the instant case, the State action which compelled the defendant to be a witness against himself was the act of admitting evidence of Coleman's prewarning/postarrest silence. In *Jenkins,* the Court held that in admitting the defendant's silence into evidence, the State had not exacted self-incrimination from the defendant. *Jenkins,* 447 U.S. at 235. To the contrary,

> [t]he Fifth Amendment guarantees an accused the right to remain silent during his criminal trial, and prevents the prosecution from commenting on the silence of a defendant who asserts the right. In this case, of course, the petitioner did not remain silent throughout the criminal proceedings. Instead, he voluntarily took the witness stand in his own defense.

*Id.* (citation omitted). In Raffel v. United States, 271 U.S. 494, 496 (1926), the Court held that "[t]he immunity from giving testimony is one which the defendant may waive by offering himself as a witness."

Although *Jenkins* involved the issue of impeachment through the defendant's prewarning/prearrest silence, the ruling has application to the instant case because in neither case does the Fifth Amendment right revolve around State action attributable to an arrest or a *Miranda* warning. The only issue is whether the State compelled Coleman to be a witness against himself. Since he voluntarily took the stand in his own defense, he waived the right to remain silent and became subject to the State's right of cross-examination like any other witness.

This court's holding in Murray v. State, 105 Nev. 579, 781 P.2d 288 (1989), does not require a contrary ruling. Our conclusion in *Murray* that a prosecutor's comment on appellant's post-arrest silence violated his right against self-incrimination was based upon the single fact that the State virtually conceded the point. No reason for this court's holding in *Murray* was given beyond that of the State's stipulation. *Murray* therefore contains neither an analysis of the instant issue nor support for the majority's ruling.

The second issue for resolution under a Fifth Amendment

analysis is whether, assuming a coerced self-incrimination as a result of State action, an impermissible burden has been placed on the defendant's right against self-incrimination by allowing the prosecution to refer to defendant's prewarning/postarrest silence for purposes of impeachment. I would endorse the ruling by the United States Supreme Court that it does not. *See* Brecht v. Abrahamson, 507 U.S. ......, 113A S. Ct. 1710 (1993); Fletcher v. Weir, 455 U.S. 603 (1982).

The defendant's burden as it relates to this issue stems from the dilemma involved in deciding whether to testify at the cost of having the State cross-examine on the subject of the defendant's silence and thereafter asking the jury to draw inferences therefrom. But once a defendant has elected to take the witness stand in his or her own defense, the right to remain silent is waived and the State has the right to engage the defendant in the refiner's fire of cross-examination. The State's compelling interest in the search for truth and the prevention of perjury thus overrides a testifying defendant's desire to avoid the question of his or her prewarning/postarrest silence and the inferences the jury may be asked to draw from that silence.

Since a defendant's Fifth Amendment privilege against self-incrimination is not absolute, *Jenkins,* 447 U.S. at 236, even if this court were to conclude that admitting impeaching evidence of Coleman's silence constituted a burden on Coleman's Fifth Amendment right to remain silent, such evidence would still be admissible if the extent of the burden is determined to be permissible in light of compelling State interests. The "threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." *Id.* In answering this question, courts balance the threat to the policies underlying the privilege against compelled self-incrimination with the State's interest in fostering truth through impeachment. *See* Brooks v. Tennessee, 406 U.S. 605 (1972); McGautha v. California, 402 U.S. 183 (1971).

As noted above, since the defendant is placed in a dilemma in deciding whether to testify and risk impeachment through evidence of his silence, the main threat to the defendant stems from the chilling effect it may have on his decision to testify in his own defense. This "threat," however, is a reasonable one when balanced against the compelling State interest in finding truth and discouraging perjury.

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution

here did no more than utilize the traditional truth-testing devices of the adversary process.

*Harris v. New York*, 401 U.S. 222, 225 (1971) (citations omitted).

Rejecting the contention that impeachment with prior silence impermissibly burdened a defendant's Fifth Amendment rights, the Court in *Jenkins* held that once a defendant elects to testify,

"[t]he interests of the other party and regard for the function of the court of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Brown v. United States*, 356 U.S. 148, 156 (1958).

Thus, impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial.

*Jenkins*, 447 U.S. at 238. The Court also noted that "[u]se of such impeachment on cross-examination allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts." *Id.* Finally, the *Jenkins* Court observed that "[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Id.* at 239.

I conclude from the foregoing that the truth-seeking objective of the trial outweighs the burden imposed on the defendant in the course of deciding whether to testify in the face of the admissibility of evidence of prior silence that would be inconsistent with the defendant's trial testimony.

*The admissibility of prewarning/postarrest silence under the Fourteenth Amendment.*

The question implicating Coleman's rights under the Fourteenth Amendment is whether the admission of prewarning/postarrest silence for impeachment purposes violates Coleman's fundamental right to due process of law, i.e., a fair trial. *Doyle v. Ohio*, 426 U.S. 610 (1976), determined that the use by the prosecutor of a defendant's post-*Miranda*-warning/postarrest silence constituted a violation of due process under the Fourteenth Amendment based upon an implicit guarantee by the State not to use the defendant's silence to impeach him or her at trial. In the instant case, the issue thus becomes whether the prosecutor, in impeaching Coleman with his prewarning/postarrest silence, has violated Coleman's due process rights based upon an implied guarantee by the State that he would not suffer such impeachment if he elected to testify in his own defense. I con-

clude that no such implied guarantee exists where, as here, a defendant's silence was not preceded by a *Miranda* warning. In Fletcher v. Weir, 455 U.S. 603 (1982), the Court reached the issue of the use of prewarning/postarrest silence in order to impeach a defendant who takes the stand in his own defense.[1] On appeal from the issuance of a writ of habeas corpus in the federal district court, the Sixth Circuit Court of Appeals affirmed, holding that it was "inherently unfair" to allow cross-examination regarding postarrest silence. The majority reasoned that a key premise in both *Doyle* and *Jenkins* was the unfairness inherent in using government-induced silence for impeachment purposes. Indeed, the Sixth Circuit expanded *Doyle,* concluding that the arrest alone is governmental action which implicitly induces a defendant to remain silent, thus rendering fundamentally unfair and a violation of due process, references to postarrest silence for impeachment purposes.

In reversing the Sixth Circuit, the Supreme Court in *Fletcher* stated that "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Fletcher,* 455 U.S. at 607. Impliedly, the Court recognized that only governmental inducement in the form of a *Miranda* warning would preclude the use of postarrest silence for purposes of impeaching a testifying defendant. I fully agree with this proposition.

A general awareness of *Miranda*-based expressions of rights and warnings is not sufficient to preclude the State from impeaching a testifying defendant by resorting to his or her prewarning/ postarrest silence. *Miranda* warnings are prophylactic measures directed at a specific arrestee. Thus, an individual suspect is given specific assurances by the State concerning rights and warnings that he may implicitly rely upon. Under such circumstances, where a suspect is advised of the right to remain silent and that anything he or she utters may be used against him or her in a court of law, the implicit representation is that invoking the right to silence will not be used against the accused in court.

To conclude, however, that a defendant may rely upon *Miranda*-type information stemming from such nongovernmental sources as movies, the electronic and print media, word of mouth or prior experience with the criminal justice system as a basis for preventing the State from impeaching him or her by using the defendant's prewarning/postarrest silence is untenable. It would

---

[1]The vitality of *Fletcher* was reaffirmed in the recent case of Brecht v. Abrahamson, 507 U.S. 619, 113A S. Ct. 1710 (1993).

attach greater priority and significance to unreliable, unfocused forms of common understanding or misunderstanding unattributable to government action than it would to the State's compelling interest in seeking truth, preventing and discouraging perjury, and facilitating accountability and justice. This I would be unwilling to do.

Moreover, the *Fletcher* Court did not fashion an absolute rule of admissibility of prewarning/postarrest silence in State criminal proceedings. Instead, the Court recognized the right of a State "to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony." *Fletcher,* 455 U.S. at 607. Thus, if this court were to embrace the reasoning in *Fletcher,* a defendant's prewarning/postarrest silence could be used to impeach a defendant who testifies at trial only if the trial judge determined that it would be properly admissible under Nevada's rules of evidence. Such considerations as relevance, probative value vis-a-vis prejudicial effect, and the degree to which the circumstances of the case may render the defendant's silence ambiguous, would enter into the trial court's determination of the admissibility of the defendant's silence.

In both Aesoph v. State, 102 Nev. 316, 721 P.2d 379 (1986), and Vipperman v. State, 92 Nev. 213, 547 P.2d 682 (1976), we held that impeachment with post-*Miranda* silence was a violation of a defendant's due process rights. However, in both cases, we explicitly limited our rulings to situations where *Miranda* warnings antedated the silence used for purposes of impeachment. In *Aesoph,* we held that "[w]hat is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the state's assurance [in the *Miranda* warnings] that *the invocation of those rights will not be penalized.*" *Aesoph,* 102 Nev. at 321, 721 P.2d at 383 (emphasis supplied). On the same issue, the *Vipperman* court concluded that "[t]o hold otherwise would . . . operate unfairly against the accused, who, *when informed of his rights,* would not suppose that his silence could in any way be used against him." *Vipperman,* 92 Nev. at 216, 547 P.2d at 684 (emphasis added).

For the reasons discussed above, I would conclude that Coleman was not deprived of his Fourteenth Amendment rights to due process when the State used his prewarning/postarrest silence for impeachment purposes during cross-examination.

Convinced that Coleman's Fifth and Fourteenth Amendment rights were not violated, I respectfully dissent from the majority's ruling to the contrary. I do, however, concur in affirming Coleman's judgment of conviction.