*1371
 
 OPINION
 

 Per Curiam:
 

 Appellant Darrin Joel Quillen (Quillen) was charged with one count of being a convicted felon in possession of a firearm, a felony, after a police officer noticed Quillen walking down a North Las Vegas sidewalk with a .22 caliber pistol in his hand. At trial, Quillen’s theory of the case was that he had taken the gun from two attackers immediately prior to his encounter with the police. We conclude that none of Quillen’s claimed errors are meritorious and affirm the conviction.
 

 FACTS
 

 While on patrol, in a marked car, an officer of the North Las Vegas Police Department observed Quillen walking along a public sidewalk carrying a gun in his left hand and a knife in his right hand. As the officer watched in his rear-view mirror, Quillen tossed the gun into the desert east of the sidewalk. The officer
 
 *1372
 
 backed up his patrol car, got out with his side arm drawn, and ordered Quillen to sit down on the sidewalk. The officer noticed blood on Quillen’s mouth and asked him if he was okay and if he had been in a fight. Quillen answered that he had and that he was okay.
 

 Another officer arrived on the scene, and Quillen was placed in handcuffs. After additional officers arrived, the first officer recovered the discarded weapon from the desert. The officer also asked Quillen to identify himself, which he did by giving the officer his name. Examination of the recovered weapon revealed that it contained five spent casings and one live round. The police also found seven live rounds of .22 caliber short ammunition in Quillen’s front-left jacket pocket and a knife sheath on his right ankle. While the officers had Quillen in custody at the scene, two Latino men, Gaytan and Reyes, approached the officers in an excited manner and told the police that Quillen had shot at them.
 

 According to Gaytan and Reyes, they had gone to a Church’s Chicken outlet at about 4:00 p.m., and after purchasing several items, they walked a few blocks and stopped at a ditch to eat. As they were eating, Quillen approached Gaytan and Reyes and began threatening them with words to the effect of: “Don’t move Mexicans .... If you move I’ll kill you.” Quillen then fired several shots at them. Quillen attempted to fire additional shots, but the gun jammed and would not fire. When Gaytan and Reyes heard the gun jam, they rushed at Quillen in an attempt to wrestle the gun away from him. In the ensuing melee, Quillen hit Gaytan in the face with the gun and hit Reyes with his fist. Quillen then reached into a sheath on his right leg and pulled out a knife. Gaytan and Reyes fled on foot, and Quillen gave chase, brandishing the gun in one hand and the knife in the other. Gaytan and Reyes managed to evade Quillen, but after seeing the police stop him, they returned to the area to tell the police about the incident. In response to the accusations of Gaytan and Reyes, Quillen told the police that the men had pointed the gun at him first, then shot at him as he was walking by along the road.
 

 Quillen was charged with one count of possession of a firearm by a convicted felon, a felony under NRS 200.481.
 
 [1]
 
 At trial, the State argued that this was a hate-motivated attack. Quillen’s theory of the case was that a possession conviction was not justified because he had obtained the gun in self-defense. Officer Ortiz was the first witness, and he testified that he passed Quillen
 
 *1373
 
 in his patrol car. Quillen was carrying a knife in one hand and a pistol in the other. Officer Ortiz pulled over and saw Quillen discard the pistol. He approached Quillen with his pistol drawn, and Quillen had dropped the knife and was sitting on the curb. Officer Ortiz identified Quillen as the individual he had confronted and indicated that Quillen had identified himself at the scene.
 

 On cross-examination, the officer admitted that Quillen had stated that the “Mexicans pointed the gun at him and shot at him as he was walking by the ditch.” Redirect examination by the prosecution established that the statement was made after the two Hispanic males came up from the ditch and told officer Ortiz that Quillen had shot at them. Officer Ortiz also stated that when he first confronted Quillen and saw blood on his mouth, he asked him if he was okay and if he had gotten in a fight. Quillen said, “Yes he [had] and he was okay.” No objection to this statement or request was made that the answer be stricken. The defense strategy appeared to be to get the defendant’s post-arrest statement in evidence through the testimony of the police officers to establish self-defense without the necessity of Quillen testifying. When the second officer on the scene testified, defense counsel further established that Quillen had told him that the “Mexicans” had pointed the gun at him and he took it away from them.
 

 In closing argument, Quillen’s counsel argued that the facts the State relied upon were not credible and that Quillen had acted in a calm, reasonable manner when confronted by police. Countering this argument, the prosecutor asked the jurors to consider how plausible was Quillen’s explanation of what occurred and continued:
 

 Defense counsel also refers to the defendant’s behavior when he was stopped by the officer, he says he didn’t run. . . .
 
 What else didn’t he do ? He didn’t chase the officer down and say, I’ve just been held at gunpoint by two unknown Hispanic males. He didn’t tell the officer when he asked, were you in a fight? Are you okay? No, these two guys just jumped me out of a ditch, I can’t believe it, you know, oh my God. No, he said, yea, I’m okay. Yeah, I was in a fight.
 

 [Defense counsel] says he wouldn’t have said anything. The defendant wouldn’t have said anything. Said, no, nothing — everything is fine, everything is ok. He’s got blood on his lip, a gun in one hand, a knife in the other. He tosses the gun. I don’t think the officer is going to believe everything is okay.
 
 I think he has to say something.
 
 Yeah, I was in a fight, I’m okay. It’s only later after [Gaytan and Reyes] come up and say that’s him, he tried to shoot at us; it’s only later that he said, no, they came at me with a gun and I took
 
 *1374
 
 it away from them. And why is that? Because he’s an ex-felon. Because he can’t possess a firearm. He needs an explanation and that’s the best he can come up with.
 

 (Emphasis added.) Quillen’s attorney made no objection to this argument.
 

 Quillen was found guilty and sentenced to six years in the Nevada Department of Prisons, to run consecutively to any other sentences. Quillen appeals.
 

 On appeal from the judgment of the district court, Quillen alleges various acts of prosecutorial misconduct, error in the admission of various items of evidence, improper refusal of proposed jury instructions, and improper limitation of the scope of his closing argument. He also argues that his sentence is excessive.
 

 DISCUSSION
 

 Admission of prior sworn testimony
 

 Quillen contends that the district court erred in allowing the prior trial testimony of Gaytan and Reyes to be read into the record in the present case. According to Quillen, the out-of-court statements violated his right, secured under the Sixth Amendment,
 
 [2]
 
 to be confronted with the witnesses testifying against him. Specifically, Quillen contends that the State failed to establish that the witnesses were “unavailable” at the time of trial, as mandated by Ohio v. Roberts, 448 U.S. 56 (1980);
 
 see also
 
 Power v. State, 102 Nev. 381, 724 P.2d 211 (1986). The State contends that, under
 
 Roberts,
 
 the efforts undertaken by the State to locate and serve Gaytan and Reyes were reasonable; therefore, the prior testimony was properly admitted. We agree.
 

 The task of serving subpoenas upon Gaytan and Reyes was assigned to Tom Lovelace (Lovelace), an investigator for the Clark County District Attorney’s Office. Lovelace testified that he had been the investigator for the entire history of the case and had successfully served Gaytan and Reyes two or three times previously (in connection with the preliminary hearing and the first trial) at their place of employment, Nevada Recycling. Lovelace further testified that, just before the present trial, he returned to Nevada Recycling, but Gaytan and Reyes were no longer employed there. He was told that Gaytan and Reyes had
 
 *1375
 
 left months before, and that they might be found at one of several other scrap yards in the area. Lovelace visited the other scrap yards, but still did not find Gaytan or Reyes. Lovelace then went to the men’s last known address, but the landlord said that they had moved out five months earlier, leaving no forwarding address. Lovelace also ran a SCOPE (Shared Computer Operation for Protection and Enforcement) check and contacted the Department of Motor Vehicles, both to no avail.
 

 On cross-examination, Lovelace testified that he did not tell Gaytan or Reyes, when he subpoenaed them previously, that there was another charge remaining and that they should keep in touch with the district attorney’s office. He further testified that, although he spoke with Gaytan and Reyes’ landlord, he did not speak to any of their neighbors, nor did he make an effort to find out if Gaytan or Reyes had any relatives in town.
 

 The United States Supreme Court has held that the ultimate question in determining “unavailability” for Confrontation Clause purposes is whether the witness is unavailable despite good-faith efforts undertaken by the prosecution, prior to trial, to locate and present that witness.
 
 See Roberts,
 
 448 U.S. at 74. What constitutes a good-faith effort is a question of
 
 reasonableness. Id.
 
 In
 
 Power,
 
 this court concluded that the State had not sustained its burden of demonstrating that the witness was unavailable at the time of trial. 102 Nev. at 384, 724 P.2d at 213. This court reasoned:
 

 During the week before trial, a police detective and the prosecutor visited and telephoned the house at which Randy Wheeler [the intended witness] lived and spoke with the owner of the house. Four days before trial, the police detective spoke to Randy Wheeler, who said that he would pick up his subpoena, but Wheeler did not do so. On the day before trial, the prosecutor spoke with Randy Wheeler’s employer and one of Randy Wheeler’s friends. And on the day of the evidentiary hearing, the police detective spoke with another of Randy Wheeler’s friends and telephoned local hospitals, jails, and law enforcement agencies.
 

 The state’s efforts to obtain Randy Wheeler’s presence at trial as a witness, outlined above, were minimal. . . . The state made absolutely no effort to contact Randy Wheeler’s relatives, neighbors, or co-employees. And the state made only nominal efforts to contact Randy Wheeler’s friends and employers. The fact that the state’s efforts to obtain Randy Wheeler’s presence at trial as a witness were so minimal, conjoined with the importance of Randy Wheeler’s testi
 
 *1376
 
 mony, compel us to conclude that the state’s efforts were not sufficiently reasonable.
 

 102 Nev. at 382, 384, 724 P.2d at 212, 213. The State argues that the efforts undertaken by the State to locate Gaytan and Reyes exceeded the efforts found to be inadequate by this court in
 
 Power.
 

 In the present case, the State’s efforts revealed that the witnesses quit their jobs, moved out of their home some five months prior to trial, and left no forwarding address. There is some evidence that they returned to Mexico. As Quillen points out, the State could have made additional efforts to locate the witnesses. For example, as brought out by the defense during trial, the State could have contacted the telephone company, the gas company, the water company, the power company, banks, the Immigration and Naturalization Service, the Internal Revenue Service, neighbors, the post office, or directory assistance. However, a reviewing court need not consider every untried effort the State could have made in locating a witness. As the Court noted in
 
 Roberts:
 
 “One, in hindsight, may always think of other things. Nevertheless, the great improbability that such efforts would have resulted in locating the witness, and would have led to [the witness’s] production at trial, neutralizes any intimation that a concept of reasonableness required their execution.” 448 U.S. at 75-76. We conclude that the efforts undertaken by the State to locate Gaytan and Reyes were reasonable and that it is unlikely that the additional efforts suggested by Quillen would have led to the witnesses’ production at trial.
 

 Finally, there is no doubt that the witnesses’ testimony was important to the State’s case, a factor found to be significant by this court in
 
 Power.
 
 Although the police observed Quillen carrying the gun, Quillen’s theory of the case was that he took the gun from Gaytan and Reyes in self-defense. The testimony of Gaytan and Reyes was the only evidence that directly refuted Quillen’s self-defense theory. Nevertheless, we conclude that, under the circumstances, the efforts undertaken by the State to locate the witnesses were reasonable, and the district court’s finding that the witnesses were “unavailable” was, therefore, not clearly erroneous. Accordingly, the district court did not err in admitting into evidence the prior testimony of Gaytan and Reyes.
 

 Admission of evidence that Quillen wore a swastika medal
 

 Quillen contends that the district court abused its discretion by allowing testimony that Quillen was wearing a swastika medal on his jacket at the time of his arrest. Quillen, who disputed the
 
 *1377
 
 existence of the swastika during closing argument, also contends that the State should have been precluded from offering evidence of the alleged swastika because the State failed to preserve the swastika for trial. In response, the State argues that testimonial evidence of the swastika was properly admitted and that Quillen was not unfairly prejudiced by the absence of the swastika medal at trial.
 

 First, Quillen argues that evidence of the swastika was irrelevant and prejudicial. According to Quillen, the swastika is irrelevant “because Nazis are not generally known for hating Mexicans in particular,” and because “the swastika is probably the most hated and feared symbol in history.” Under NRS 48.035, evidence, although relevant, “is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice.” The decision to admit or exclude evidence, after balancing the prejudice to the defendant with the probative value, is within the discretion of the trial judge, and “the trial court’s determination will not be reversed absent manifest error.” Kazlan v. State, 108 Nev. 67, 72, 825 P.2d 578, 581 (1992). In the present case, the district court heard arguments
 
 in limine
 
 for and against the admission of the swastika evidence. The State argued that the incident involving Quillen and Gaytan and Reyes was a hate-motivated crime and that the swastika was relevant to the issue of motive. The district court concluded that the State was entitled to put on its theory of the case and thus could introduce evidence of the swastika. Under the circumstances, we conclude that the district court’s conclusion that the probative value of the swastika evidence on the issue of motive outweighed its prejudicial effect was not manifestly erroneous.
 

 Second, Quillen argues that the swastika evidence should have been excluded because the State failed to preserve the alleged swastika medallion.
 
 [3]
 
 Quillen cites Deere v. State, 100 Nev. 565, 688 P.2d 322 (1984). In
 
 Deere,
 
 we held:
 

 When an accused seeks dismissal for the state’s good-faith loss or destruction of material evidence, he or she must show prejudice flowing from the unavailability of the evidence. To establish prejudice, the accused must make “some showing that it could be reasonably anticipated that the
 
 *1378
 
 evidence sought would be exculpatory.” Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 108 (1979).
 

 100 Nev. at 566, 688 P.2d at 323. In the present case, Quillen did not seek dismissal of the case, but merely exclusion of the evidence; nevertheless, we conclude that the reasoning underlying
 
 Deere
 
 is applicable to this case even though the appropriate remedy may be something less drastic than outright dismissal.
 

 The question then, under
 
 Deere,
 
 is whether Quillen has made some showing that the evidence would have been exculpatory. The swastika itself, obviously, would not have been exculpatory; although the jacket, if preserved by the police in its condition at the time of arrest, would have been
 
 exculpatory
 
 — provided,
 
 of course, that it did not display a swastika medallion.
 
 However, Quillen, who did not testify at trial, made no showing at trial that the swastika did not exist. Quillen was able to attack the credibility of the testifying officer with the absence of the swastika at trial and in the police report, but Quillen adduced no evidence, testimonial or otherwise, that the swastika did not exist. Under the circumstances, Quillen has not met his burden of making “some showing that it could be reasonably anticipated that the evidence sought would be exculpatory.”
 
 Boggs,
 
 95 Nev. at 913, 604 P.2d at 108. Accordingly, we conclude that Quillen was not prejudiced by the State’s failure to preserve the swastika.
 
 [4]
 

 For the reasons set forth above, we conclude that the district court did not err in admitting into evidence testimony regarding a swastika medal on Quillen’s jacket.
 
 [5]
 

 Prosecutorial comments on Quillen’s post-arrest silence
 

 On cross-examination of one of the arresting officers, the
 
 *1379
 
 defense elicited testimony regarding certain exculpatory statements made by the defendant after his arrest, namely, that he took the gun from Gaytan and Reyes in self-defense.
 
 [6]
 
 On redirect examination, the prosecution elicited testimony of other, earlier post-arrest statements, made by Quillen, that, it contends, contradict his self-defense explanation. In closing argument, the prosecution asked the jury to consider why Quillen waited until he was confronted by Gaytan and Reyes before claiming that the two men had attacked him with the gun first. Quillen contends that the State’s closing arguments are references to his post-arrest silence and that such references are improper. We disagree.
 

 In Coleman v. State, 111 Nev. 657, 895 P.2d 653 (1995), we held that the use of a defendant’s post-arrest silence to impeach an exculpatory explanation subsequently offered by the defendant at trial is an impermissible comment on the defendant’s right to remain silent. However, in this case, Quillen did not take the stand in his own defense, and the closing arguments of counsel dealt with statements made by the defendant to police officers at the scene shortly after he was arrested and the inferences that could be drawn from them.
 

 It is apparent that most of the statements made by Quillen to the police officers were elicited by his own counsel. The State merely asked about Quillen’s initial statement made before the two Hispanic men joined the police officers. No objection was made, and it appeared as if Quillen wanted these statements in evidence to present his self-defense theory without testifying himself. A defendant cannot take one position at trial and assert a different theory on appeal.
 
 See
 
 Keeney v. State, 109 Nev. 220, 224, 850 P.2d 311, 314 (1993). Further, if we view the initial statement of “I was in a fight but I’m okay” as inconsistent with his subsequent statements, then it would be permissible for the prosecution to elicit that first inconsistent statement.
 
 See
 
 Anderson v. Charles, 447 U.S. 404, 408 (1980) (holding that Doyle v. Ohio, 426 U.S. 610 (1976), “does not apply to cross-examination that merely inquires into prior inconsistent statements”). If it is viewed as a consistent statement, then it is difficult to see how this statement was harmful when it assisted the defendant in establishing his self-defense theory. It should be remembered that in both
 
 Coleman
 
 and
 
 Doyle
 
 the rulings prevented a prosecutor from using a lawful silence against the defendant’s explanation at trial. Here we have a review of Quillen’s statements and conduct when arrested, the inferences to be drawn from them, and whether they were in any way inconsistent. This is a substantially different situation than those presented in
 
 Coleman
 
 or
 
 Doyle.
 

 
 *1380
 

 Whether a witness gave an opinion as to the merit of the case
 

 The prosecutor, over Quillen’s objection, elicited testimony that this case, but not all cases, was assigned a case number by the North Las Vegas Police Department. Quillen argues that the only inference that the jury could have made was that the police believed that the case had merit. Quillen contends that eliciting such a statement was improper.
 
 See
 
 Aesoph v. State, 102 Nev. 316, 721 P.2d 379 (1986) (prosecutor precluded from giving personal opinion that case for the state has merit). The State argues that the testimony was relevant to establishing the chain of custody for physical evidence collected by the arresting officers. We conclude that the officer’s testimony was relevant and did not constitute an improper opinion on the merit of the case.
 

 Refused jury instruction regarding warning shots
 

 The district court refused Quillen’s proposed jury instruction that stated that if the defendant is confronted by one or more persons who aim or fire a firearm towards him, and the defendant then seizes that firearm, the defendant is allowed, under the law, to fire warning shots to prevent possible further threats from the said other person or persons. Quillen contends that the district court abused its discretion by denying him an instruction on his theory of the case.
 
 See, e.g.,
 
 Roberts v. State, 102 Nev. 170, 717 P.2d 1115 (1986) (a defendant is entitled to jury instructions that comport with his theory of the case as disclosed by the evidence, no matter how weak or incredible that evidence may appear to be).
 
 But see
 
 Barron v. State, 105 Nev. 767, 783 P.2d 444 (1989) (it is not error for a trial judge to decline proffered instructions, even theory-of-the-case instructions, when the subject matter of the proffered instructions is substantially covered by other instructions actually given by the trial court).
 

 We conclude that the district court properly refused the proffered instruction. First, Quillen has presented no authority in support of such an instruction.
 
 See
 
 Tahoe Village Realty v. DeSmet, 95 Nev. 131, 136, 590 P.2d 1158, 1162 (1979) (summarily rejecting novel proposition when no relevant authority cited). Second, Quillen’s theory of the case is adequately covered by other instructions actually given by the district court.
 
 [7]
 

 
 *1381
 

 Refused jury instruction regarding inconsistent statements
 

 Quillen contends that the district court also erred in rejecting his proposed jury instruction that would have instructed the jury that a prior inconsistent statement may be considered for the purpose of testing the credibility of a witness. Quillen cites Levi v. State, 95 Nev. 746, 602 P.2d 189 (1979), in which the witnesses at trial repudiated statements they made at the preliminary examination. The State argues that the statements made by Gaytan and Reyes, that Quillen verbally threatened them and then shot at them, are consistent throughout the proceedings and, therefore, this case is distinguishable from
 
 Levi.
 
 Examples of the kinds of inconsistencies alleged by the defense are: (1) that on cross-examination, Gaytan said that Quillen’s exact words were, “Mexicans, you’re going to die. Don’t move, because you’re going to die,” whereas, in his statement to the police, Gaytan said that Quillen’s words were “I’m going to kill you Mexicans”) and; (2) that, at trial, Gaytan said that there were two shots, but at the preliminary hearing, he said that there were two or three shots. The trial court must refuse to give a jury instruction that is not pertinent. NRS 175.161(3). In this case, the district court rejected Quillen’s proposed instruction, concluding that the alleged inconsistencies were trivial. We conclude that this was not an abuse of discretion, especially in light of other instructions given by the district court.
 
 [8]
 

 The State’s references to the Thanksgiving holiday
 

 Quillen contends that he was prejudiced by references in the prosecutor’s closing arguments to the crime having occurred on Thanksgiving Day. Quillen notes that the prosecutor referred to Thanksgiving no fewer than eight times, stating on two occasions that Gaytan and Reyes were having their “Thanksgiving meal.”
 
 [9]
 
 Quillen argues that the logical inference from the prosecutor’s comments is that what happened to Gaytan and Reyes was “some sort of Thanksgiving Day massacre.” The State contends that
 
 *1382
 
 Quillen has not established that he was harmed by the prosecutor’s remarks.
 

 This court has repeatedly held that so-called “holiday” arguments are inappropriate, although they rarely warrant reversal by themselves.
 
 [10]
 
 Such remarks “have no purpose other than to arouse the jurors’ emotions.” Williams v. State, 103 Nev. at 109, 734 P.2d at 702. “Holiday” arguments are generally made to arouse jurors’ passions by referring to the victim and a holiday-such as the victim will never celebrate Christmas again with his children. Quillen committed the crime on Thanksgiving Day, and the prosecutor referred to that day and the Thanksgiving meal the two men were eating more than she probably should have. However, no objection was made to any of the references and nothing further was stated to emotionalize the situation. It is well established that, as a general rule, any improper remarks made by the prosecutor in closing argument will not be considered on appeal if not objected to at trial. Dearman v. State, 93 Nev. 364, 368-69, 566 P.2d 407, 409-10 (1977).
 

 Since no objections were made to any of the Thanksgiving references and we do not see how these statements could have been prejudicial to Quillen, any error that may have occurred was harmless.
 

 State’s reasonable doubt explanation
 

 Quillen contends that he was prejudiced by the prosecutor’s description of reasonable doubt as “the kind of doubt that would govern you in the weightier affairs of life, buying a house, changing jobs, major life decisions.” According to Quillen, the prosecutor’s explanation impermissibly diminishes the reasonable doubt standard. Quillen notes that the model instruction for the United States Court of Appeals for the Ninth Circuit no longer analogizes reasonable doubt to the most important decisions in one’s life, because decisions like “choosing a spouse, buying a house, borrowing money, and the like . . . may involve a heavy element of uncertainty and risk-taking and are wholly unlike the decisions jurors ought to make in criminal cases.”
 
 See
 
 9th Cir. Crim. Jury Instr. 3.03 cmt. (1995). We find the reasoning underlying the Ninth Circuit model instruction persuasive,
 
 *1383
 
 although we note that this kind of improper explanation would ordinarily be harmless.
 
 See, e.g.,
 
 Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991) (improper explanation of reasonable doubt cured by proper written jury instruction regarding reasonable doubt). Jury Instruction No. 12 contained the statutory definition of reasonable doubt provided in NRS 175.211, and we deem the prosecutor’s remarks concerning reasonable doubt to be harmless error.
 

 Refusal to provide the jury with a definition of Quillen’s prior felony
 

 Prior to closing arguments, defense counsel requested that he be allowed to provide the jury a definition of “attempted statutory sexual seduction,” Quillen’s prior felony conviction. Statutory sexual seduction denotes consensual sex with an under-aged person. Quillen contends that he was prejudiced by the district court’s denial of his request, because the jury may have mistakenly believed that he had been convicted of forcible rape. The State argues that there is no authority to support Quillen’s request.
 

 In Sanders v. State, 96 Nev. 341, 609 P.2d 324 (1980), cited by both parties, we stated that “the prosecution should only be allowed to prove the fact, instead of the nature, of a prior conviction where the effectiveness of the prosecutor’s case is not impaired, and unnecessary and improper prejudice to the accused is avoided.”
 
 Id.
 
 at 343, 609 P.2d at 326. Sanders was convicted of robbery with the use of a deadly weapon and of being a convicted felon in possession of a concealable firearm. His prior convictions were for attempted robbery and rape. On appeal, Sanders argued that the district court abused its discretion in denying his motion
 
 in limine
 
 to exclude evidence of the nature of his two prior felony convictions because he had offered to stipulate to the fact of those convictions. We reversed, holding that, in a trial for
 
 robbery,
 
 it was reversible error to inform the jury, for the purposes of proving a felon-in-possession charge, that Sanders’ prior felony convictions included a conviction for
 
 attempted robbery. Id.
 
 at 343, 609 P.2d at 326.
 

 In the present case, Quillen made no effort to preclude identification of the nature of his prior felony convictions. Instead, the defense entered into a stipulation in which Quillen agreed that the jury would be informed not only of the fact of his prior felony conviction, but what the felony was and when it occurred. Under the circumstances, we conclude that it was not an abuse of the district court’s discretion to deny Quillen’s request to introduce further explanation of the nature of Quillen’s prior convictions.
 

 
 *1384
 

 Quillen’s sentence was not excessive
 

 Quillen was sentenced to six years in prison, the maximum sentence for an ex-felon in possession of a firearm. However, we have stated many times that a sentence will be upheld if it is within the district judge’s authority to assess. Silks v. State, 92 Nev. 91, 94, 545 P.2d 1159, 1161 (1976). This sentence was within the district judge’s authority, and the claim that it was excessive has no merit.
 

 CONCLUSION
 

 We conclude that: (1) the district court did not abuse its discretion in allowing the prior trial testimony of Gaytan and Reyes to be read into the record; (2) the district court did not abuse its discretion in allowing testimony regarding a swastika medal on Quillen’s jacket at the time of his arrest; (3) the State did not improperly refer to statements Quillen made when first confronted by the police; (4) the arresting officer did not testify as to his opinion of the merit of the State’s case; (5) the district court did not abuse its discretion in refusing Quillen’s proposed jury instruction regarding warning shots; (6) the district court did not abuse its discretion in refusing Quillen’s proposed jury instruction regarding inconsistent statements; (7) any error that occurred by the State’s repeated references to the Thanksgiving Day holiday was harmless; (8) the State’s improper explanation of reasonable doubt during closing arguments was harmless error; and (9) the district court did not abuse its discretion by refusing to allow the defense to define for the jury the meaning of “attempted statutory sexual seduction,” Quillen’s prior felony conviction. We affirm Quillen’s judgment of conviction for violation of NRS 200.481.
 

 [1]
 

 Quillen was also charged with several other felonies. In a separate trial, he was convicted of two counts of assault with use of a deadly weapon and one count of misdemeanor battery. This court dismissed Quillen’s appeal in that case.
 
 See
 
 Quillen v. State, Docket No. 25658 (Order Dismissing Appeal, July 28, 1995).
 

 [2]
 

 “In all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him . . . .” U.S. Const, amend. VI. The Sixth Amendment is made obligatory on the States by the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400 (1965).
 

 [3]
 

 Only one officer testified to seeing the swastika. There was no mention of the swastika in the police report filed after the incident, and no photographs of the alleged swastika were introduced at trial. The jacket was not impounded by the police; rather, it was apparently returned to Quillen after his arrest.
 

 [4]
 

 We note that the absence of the properly preserved jacket may seem to have placed Quillen in the unenviable position of having to prove a negative. However, the elfect of the missing swastika on the credibility of the State’s witness is not to be discounted. In fact, the State twice played down the importance of the swastika evidence during closing argument, commenting that the State did not need to rely on the swastika to prove its case. Quillen argues that these statements are a concession by the State that the swastika was irrelevant. We conclude that the statements were merely a recognition by the State of the weakness of the uncorroborated swastika testimony.
 

 [5]
 

 We further conclude that Quillen’s attempt to liken this case to Harris v. People, 888 P.2d 259 (Colo. 1995), is unfounded.
 
 Harris
 
 involved a prosecutor comparing a defendant’s acts to those of Saddam Hussein. In ruling that the statements were improper, the court held that the comments were irrelevant, involved events with no connection to the litigation, and were used to raise the passions of the jury. 888 P.2d at 266. As the State correctly points out, the prosecutor in this case was referring to evidence adduced at trial and not to extraneous events in other parts of the world.
 

 [6]
 

 The district court overruled the State’s objection to the admission of these hearsay statements. The State has not appealed this ruling.
 

 [7]
 

 For example, Instruction No. 8 provided: “An ex-felon has the same rights of self defense as does any other person”; Instruction No. 9 provided: “A person, who is not the original aggressor, has no duty to retreat before using deadly force, if a reasonable person in a position of a non-aggressor would believe that his assailant is about to kill him or cause him serious bodily harm”; Instruction No. 10 provided: “If you have a reasonable doubt
 
 *1381
 
 as to whether the firearm was initially in the possession of Leopoldo Gaytan and/or Francisco Reyes and whether the defendant reasonably believed that he was about to be seriously injured or killed, even if there was no actual or immediate danger to the defendant, then you must find the defendant not guilty.”
 

 [8]
 

 instruction No. 15, for example, instructed the jury that it was permitted to determine the “credibility and believability” of a witness based upon, inter alia, “the strength or weakness of his recollections.”
 

 [9]
 

 There was no evidence adduced at trial that Gaytan and Reyes were in fact observing the Thanksgiving holiday.
 

 [10]
 

 See, e.g.,
 
 Williams v. State, 103 Nev. 106, 734 P.2d 700 (1987) (Valentine’s Day); Dearman v. State, 93 Nev. 364, 566 P.2d 407 (1977) (New Year’s Day); Moser v. State, 91 Nev. 809, 544 P.2d 424 (1975) (Christmas). In each of these cases, the improper statements were held not to be prejudicial.