CONSUELO WINIARZ, AKA CONSUELO WEST, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 17510

March 31, 1988                              752 P.2d 761

*George R. Carter* and *John G. Watkins,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, *Roberta J. O'Neale,* Chief Deputy District Attorney, Clark County, for Respondent.

---

## OPINION

By the Court, SPRINGER, J.:

Consuelo Winiarz shot Jacob Winiarz and killed him.[1] She claims that it was an accident, done as part of an April Fools' routine acted out by Jacob and her on April Fools' Day and on at least one other occasion prior to the fatal shooting. Consuelo stands convicted of premeditated first degree murder with the use of a deadly weapon and is serving two consecutive sentences of life imprisonment without possibility of parole.

Consuelo's story goes like this: On April Fools' Day, Consuelo and Jacob decided to play a little joke on their friends. Jacob thought it would be funny if they were to stage a fake shooting with blank ammunition. The couple pretended to be engaged in an argument during which Consuelo fired a blank shot at Jacob. Jacob ran down the hall screaming and then fell "dead" on the floor, Consuelo fell to her knees over his "corpse." Great fun. "April Fool!"

The trick worked so well, according to Consuelo, that they tried it again before the time of the fatal shooting. Jacob did the loading of the gun. On April 22, Easter Sunday, they tried it one last time. The day started out happily for Consuelo and Jacob. They enjoyed marital relations together. Consuelo prepared breakfast. She worked in the garden and washed and waxed her car. Consuelo drank beer, a case of it, according to Consuelo's testimony. Friends stopped by. Consuelo says that she was not in any way angry with Jacob, and they had no arguments or other conflict.

In the afternoon, Jacob came into Consuelo's bedroom and, by Consuelo's testimony, said that he wanted to do their April Fools' routine. The plan was to fake an argument about Jacob not

---

[1]Consuelo and Jacob were married in a ceremony determined by the trial judge in this case to be invalid.

waxing the car. Consuelo claims that Jacob handed her the gun and after screaming loudly for the benefit of guests, that he had "better go wax the f---ing car or [she] would kill him," Consuelo pulled the trigger. Jacob turned, as before, ran down the hall screaming and fell to the floor, dead. Evidence indicated that four bullets were fired, and three bullets struck Jacob.

Consuelo testified that she walked past Jacob in the hall, laid the gun down on the kitchen table, and returned to the bedroom to put on her makeup. When she still heard Jacob screaming, she walked back to Jacob and said, "Get up, asshole." Hearing him moan and seeing blood, Consuelo tried to telephone for help and ran out to the street screaming for help.

The prosecution rejected Consuelo's April Fools' story and charged a planned, intentional killing on Consuelo's part. The prosecution's case casts the episode in a different light. Witnesses for the prosecution testified that Consuelo admitted being angry with Jacob on the day of the killing and testified that Jacob's ex-wife had annoyingly telephoned on that day. One witness testified that Consuelo had, in her presence, ridiculed Jacob's sexual talents. Another prosecution witness testified that Consuelo did not appear to be intoxicated or under the influence of alcohol.

When the shots were heard by the guests, one of them remarked that they should not be concerned because the couple had played this "joke" before. Later, however, one of the guests testified to having heard Consuelo say, in an "evil, queer voice": "It wasn't a joke." Another witness testified that as Consuelo placed the gun on the kitchen table she said: "Don't touch the gun. I just shot my husband. I have to call an ambulance." Afterwards, witnesses saw Consuelo hysterically screaming, outside of the house, that she had shot Jacob.

Undisputed evidence establishes that Consuelo was intoxicated on that day. Her blood alcohol analysis revealed a .19 percent by weight at 7:20 p.m., approximately two and one-half hours after the shooting.[2] Consuelo did not have her glasses on at the time of the shooting and her optometrist testified that Consuelo could not see clearly beyond four feet. She has always claimed that the shooting was an accident.

A reading of these facts leaves the reader without any doubt as to what this case is all about: Is Consuelo telling the truth about the April Fool's joke? The answer to this question tells whether she is a murderer or not. Unfortunately for Consuelo this question was answered for her by her own doctor, who, when called

---

[2]Dr. Verdun Trione testified that an individual, like Consuelo, would have had a blood alcohol level of .23 or .24 percent by weight at 5:00 p.m. if her blood alcohol at 7:20 p.m. was .19 percent by weight.

by the prosecution, testified that in his opinion she was a liar and that she "murdered her husband in cold blood in a premeditated fashion." The jury agreed with Consuelo's doctor, a psychiatrist appointed by the court to examine her, and by their verdict, found that she was indeed a cold-blooded murderer, finding her guilty of murder in the first degree and punishing her with a sentence of life imprisonment without possibility of parole.

We hold, first, that it was error under Esquivel v. State, 96 Nev. 777, 617 P.2d 857 (1980), to permit Dr. Master to attack Consuelo's credibility, to say that she was "lying" and "feigning," when such testimony was based largely upon his psychiatric interview with her.

Secondly, under McKenna v. State, 98 Nev. 38, 639 P.2d 557 (1982), cert. denied, 106 S.Ct. 868 (1986), it was error for Consuelo's psychiatrist to use the confidential contents of his interview with her in order to assist the prosecution in obtaining a conviction.

Finally, Dr. Master's testimony that he believed Consuelo was a cold-blooded murderer goes to the ultimate issue in this case and constituted a highly prejudicial, improper expression of opinion.

Some explaining is in order to show how this all could possibly have happened, a defendant's being convicted at the hands of her own physician. Dr. Master was called in as one of two psychiatrists appointed by the court at the request of defense counsel. Apparently defense counsel, finding his client in a very disturbed emotional condition, asked the court to appoint two psychiatrists under NRS 178.415, in order to have professional opinions on his client's sanity at the time of the shooting and on whether his client was mentally competent to stand trial.

The two appointed psychiatrists examined Consuelo and concluded that she was not mentally incapacitated (that she was sane) at the time of the shooting and that she was mentally competent to stand trial.

After receiving the report of the examination by Dr. Master and the other psychiatrist the trial proceeded. No defense of insanity was interposed or suggested; and the defense did not, naturally, call Dr. Master. The defense did, however, call a psychologist, Dr. Verdun Trione, to testify on the effect that alcohol would have on a person of Consuelo's weight and level of alcohol consumption on the date of the shooting. Had Dr. Trione's testimony stopped here, there would not have been any justification for the state's calling Dr. Master as its own witness because the defense had never made an issue of Consuelo's sanity and had maintained only that she had, in a intoxicated condition, made a tragic mistake.

Defense counsel went beyond the defense of accident and mistake, however, and asked Dr. Trione if a person like Consuelo, one weighing what she did and having consumed the amount of alcohol that she did, would be capable of premeditation or deliberation.[3]

Defense counsel's asking Dr. Trione about "a person's" ability to premeditate and deliberate introduced an issue that had not theretofore been before the jury. Consuelo herself never claimed such a cognitive incapacity and, as stated, rested her defense entirely on mistake and misadventure contributed to by alcohol abuse.

The prosecution, understandably and correctly, took this testimony as giving it an opportunity to call a psychiatrist to rebut Dr. Trione's hypothesis, that someone in Consuelo's condition was unable to perform the cognitive processes necessary to be able to premeditate and deliberate. Consuelo's psychiatrist, Dr. Master, was called to do the task.[4]

The crucial question in this case was the prosecutor's asking Dr. Master to describe "the state of mind of the defendant at the time of this offense." Permitting the doctor, over objection, to answer this question opened up a chamber of horrors that culminated in the jury's being told by the court-certified expert that his patient (in a sense) was a liar and a murderer.

Asking the doctor to testify as to Consuelo's "state of mind" permitted comment on a wide array of damning testimony.

---

[3]Dr. Trione, was asked to give his opinion on the effect of alcohol on a hypothetical female person who weighed 120 pounds, had had nothing to eat during the day, had been drinking beer all day and had a blood alcohol content of between .19 and .23 percent (facts which fit Consuelo's case according to the evidence). The psychologist testified as follows:

Q.  A person whose [sic] a .19, .19 to a .23, would that person be capable of premeditation?
A.  I don't see how.
Q.  What about deliberation?
A.  No. They are too disoriented.

The psychologist gave other testimony concerning the mental state of a person in the stated condition of intoxication. He did not testify that Consuelo was insane or otherwise mentally incapacitated.

[4]It may not be entirely accurate to refer to Dr. Master as Consuelo's physician even though it is safe to assume that neither Consuelo nor her defense attorney thought that he was to be a state's witness, hired to give incriminating evidence out of his psychiatric interview. Dr. Master was Consuelo's psychiatrist in the sense that he was employed to diagnose her mental condition. In order for the doctor to do this, some kind of physician-patient relationship had to exist. The doctor's duty to Consuelo arises out of this relationship, and, "[I]t is immaterial whether the court ordered examination was at the request of defendant or the prosecution" or that both were to receive copies of the report. *McKenna,* 98 Nev. at 39, 639 P.2d at 558 (citing Collins v. Auger, 428 F.Supp. 1079, 1082 (S.D. Iowa 1977).

Although, as said, sanity was never in issue, the doctor testified that Consuelo had the ability to know right from wrong and, in essence, was perfectly sane at the time of the shooting. Worse, he described her as "dis-social," as an histrionic, as a liar and as a murderer. Unlike the testimony of the psychologist called by the defense, Dr. Master did not testify in terms of a hypothetical person; rather, he gave his "clinical impression" of Consuelo herself. The following is an outline of Dr. Master's broad-spectrum story of Consuelo's "mental state":

> The prosecution, in exploring Consuelo's "mental state," went about asking Dr. Master which of his two original "impressions," (1) confused, accidental shooting while playing a joke, or (2) cold-blooded murder, he now, as a witness for the prosecution, favored.
>
> To assist the doctor in choosing between the two impressions the district attorney read into the record several pages of incriminating "what-ifs." For example, the district attorney asked Dr. Master if he had taken, since his original examination of Consuelo, "the opportunity to review a large number of police reports and witness statements in this matter?" Dr. Master said, "Yes," that he did have an opportunity to review a large number of unspecified reports and statements. Dr. Master was then asked if he had considered two specified reports, one from Dr. Acosta, another from a psychiatric counselor, a Mr. Pheifer. Defense counsel advised the court that, as an officer of the court, he had never received such reports.
>
> Dr. Master then testified that in making his choice between the accident and the murder scenarios, his "conversation with the Metro dispatcher was of some assistance." No one knows what this conversation was about or how it assisted the doctor in making his choice between diametrically opposed impressions.
>
> A number of other "hypothetical facts" were presented to Dr. Master in the presence of the jury, including one that Consuelo "tends to make verbal threats such as, "I'm going to shoot you in the balls if you don't do what I say to do." Defense counsel objected to this line of questioning. The objection was overruled.
>
> The prosecutor then asked Dr. Master to consider the various reports and a lengthy list of hypothetical facts too numerous to include in this opinion, and asked him: "[W]hat would your opinion *now* be as to her state of mind?" (Emphasis added). In answer to this question Dr. Master testified that these new "facts" would lead him toward the "second possibility" in his original report—the cold-

blooded, premeditated murder possibility. He then went on to make a new diagnosis of Consuelo as possessing a histrionic and "dis-social personality," described in terms of "lying," "faking," "feigning" and engaging in a "Sarah Bernhart [sic] type routine," thereby directly attacking Consuelo's credibility, the most important and crucial issue in her defense.

In *Esquivel* we condemned an examining psychiatrist's challenging an examined subject's credibility. Esquivel was accused of rape. He admitted the sexual act but claimed that it had been consented to. His credibility was clearly the most important element of his defense. The prosecution impeached Esquivel's credibility with statements made to a psychiatrist during a court-ordered mental examination. In *Esquivel* we said:

> We believe that admission of these statements was error as a subject being examined by a court appointed physician should feel free in such a clinical climate to discuss all the facts relevant to the examination without the guarded fear that the statements may later be used against him. Fair play dictates nothing less. . . . Here the principal issue in the case was Esquivel's credibility; the damaging evidence introduced to impeach his own testimony was garnered during Esquivel's mental examination. We may not deem the evidence harmless error under the factual posture presented and must therefore reverse and remand the case to the district court for a new trial.

(Footnotes and citations omitted). Exactly the same considerations are present in the case now before us.

The rule in *McKenna* has also been violated—not so clearly as in the *Esquivel* rule, but still violated.

In *McKenna,* we condemned the presentation by a psychiatrist of admissions of guilt made by a defendant during his psychiatric interview and examination. The admission made by McKenna related to commission of the criminal act itself, the *actus reus,* rather than the *mens rea.* The issue in the case before us is not the act but the intent. Consuelo's intent in this case is just as important a part of her guilt or innocence as was the question of whether McKenna did or did not inflict a mortal wound on his cellmate.

If Consuelo had admitted flatly to Dr. Master that she had intentionally killed Jacob, there would be no distinction at all between this case and *McKenna.* The only difference between the present case and one involving a direct admission is that Dr. Master's testimony that Consuelo was lying and had in fact

murdered her husband comes not from a single-statement admission but rather from a composite of the statements made by Consuelo in her psychiatric interview.

In *McKenna* we said that the testimony of Dr. Master (the same), telling of admissions made by McKenna about killing his cellmate, could not in fairness be used to convict him. Concerning the use of admissions made in the course of a psychiatric examination, we said that "[f]air play does indeed dictate that our trial courts not appoint a psychiatrist to examine the accused and then apply the confidential contents of the interview to obtain a conviction." *McKenna,* 98 Nev. at 39, 639 P.2d at 558.

In *McKenna* factual admissions of McKenna's criminal agency were used "to establish his guilt," whereas, the entire interview of Consuelo with Dr. Master was used by him to establish her guilt. *Id.* To borrow additional language from *McKenna,* Dr. Master was allowed "to examine [the] accused and then apply the confidential contents of the interview to obtain a conviction."[5] In doing this there was, as in *McKenna,* a violation of federal constitutional rights to due process, and we are obliged to apply again the test of Chapman v. California, 386 U.S. 18 (1966). To affirm this conviction we must be able to declare that the constitutional error was harmless beyond a reasonable doubt. This we cannot do.

Borrowing again from *McKenna:* "Applying the *Chapman* standard, it is within the realm of possibility that, absent the constitutionally forbidden admissions contained in the psychiatrists' testimony, honest, fair-minded jurors might have brought in a lesser verdict. Under these circumstances, it is impossible for us to say that the state has demonstrated, beyond a reasonable doubt, that the evidence did not contribute to [Consuelo's] conviction. We therefore reverse and remand for new trial."

As a final basis for reversal, we specify Dr. Master's expression of opinion as to Consuelo's guilt or innocence. The doctor's diagnosis of Consuelo as a murderer goes considerably beyond the bounds of permissible expert opinion. Dr. Master was not asked: "Doctor, in your opinion, based upon your examination of Consuelo Winiarz, is she or is she not guilty of murder?", but Dr. Master's testimony comes very close to answering this question.

---

[5]The state argues that Dr. Master's testimony is exempt from the *McKenna* rule because he testified only as to mental condition and not to "guilt." In the case before us guilt and mental condition are inextricable. There is no question about Consuelo's responsibility for the homicide. The question is whether she intended to kill Jacob or made a giant mistake. Dr. Master pretty much settled this question.

We hold that it was error to permit Dr. Master, under the guise of describing Consuelo's mental state, to give to the jury, based on his psychiatric examination, an expert opinion that the woman he examined, now before the bar of justice, was plainly and simply a murderer who killed her "husband in cold blood in a premeditated fashion." Such a usurpation of the jury function by a qualified expert is undeniably, of itself, reversible error.[6]

Independently and in concert, the four mentioned errors require that this conviction be reversed. The matter is, then, reversed and remanded for a new trial.

GUNDERSON, C. J., STEFFEN, YOUNG, and MOWBRAY, JJ., CONCUR.

---

[6]This proposition is codified in Rule 704(b) of the Federal Rules of Evidence in the following terms:

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.