WILLIAM CARROLL MURRAY, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 18120

WILLIAM CARROLL MURRAY, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 19616

October 18, 1989                           781 P.2d 288

[Rehearing denied November 30, 1989]

*Edward B. Horn,* Reno, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, and *Gary H. Hatlestad,* Deputy District Attorney, Washoe County, for Respondent.

---

[5]The Honorable John S. McGroarty, Judge of the Eighth Judicial District Court, was designated by the Governor to sit in place of The Honorable Robert E. Rose, Justice. Nev. Const. art. 6, § 4.

## OPINION

*Per Curiam:*

Following a jury trial, appellant William Murray (Murray) was convicted of three counts of sexual assault and sentenced to fifteen years in the Nevada State Prison. The district court further denied Murray's petition for post-conviction relief. After review of Murray's assignments of error on this consolidated appeal, we conclude that the conceded prosecutorial misconduct in this case constituted reversible error. Accordingly, we reverse and remand for a new trial.

### FACTS

On June 6, 1986, Mrs. Carla Tefteller (Tefteller) was visiting a friend in the Reno area with her husband of nine years, Toby Tefteller. Around 3:00 p.m. on June 6, Tefteller drove to a convenience store in the car of her friend's fiance, David Patow (Patow). Upon leaving the store, she discovered the car would not

start. She phoned her friend for a ride home, but the friend said Tefteller would have to wait until Patow returned home with another car. Tefteller asked appellant Murray for a jump start. Unable to jump start the car, Murray offered Tefteller a ride home and she accepted. Tefteller testified that Murray was supposed to give her a ride back to her friend's house across town.

Heading down Stead Boulevard, Murray requested they stop first at his house to pick something up and Tefteller agreed. At the house were eight or more people, including at least two women and three children. At about 4:00 p.m., after some introductions, Tefteller called her friend from the kitchen phone. Taking the telephone from Tefteller, Murray promised Patow he would return Tefteller to the store in fifteen to thirty minutes. Patow proceeded to the store and waited for Tefteller. After the phone call, Murray directed Tefteller to wait in Murray's back bedroom. Tefteller testified she agreed to go because she "figured" there was something elsewhere in the house she was not supposed to see. She sat on the floor and waited for Murray.

Tefteller had an alcoholic drink in the front seat of her car at the convenience store, and several witnesses testified she appeared to have been drinking. Tefteller admitted she mixed herself a drink at the house. She testified she took only a few sips of this drink, but Murray states she drank at least two mixed drinks at the house. One witness testified that Tefteller appeared drunk.

A witness present at the house testified that Tefteller was at the house for a total of at least two and one-half hours. What occurred during the time Murray and Tefteller were alone in the back bedroom is known for certain only to Murray and Tefteller. Tefteller testified that when Murray returned to the room he threw her on her back and then stuck his hand down her throat and wrapped her head and mouth with duct tape to stifle her screams. She testified that she tried to bite Murray's hand when it was in her throat, and that Murray threatened to take out his shotgun and knife unless she cooperated. In compliance with a demand from Murray, she removed her tampon and threw it into a corner. Tefteller testified Murray raped her three times. On three occasions other persons knocked on the bedroom door. Each time, Tefteller testified, she ripped the tape off her mouth and screamed. Some time after the third knock, Murray let Tefteller open the door to find her friend's fiance David Patlow, who was supposed to be waiting at the convenience store.

Contrary to Tefteller's testimony, Murray stated that Tefteller told him at the convenience store that she would like to have a few drinks at Murray's house while waiting for Patow to arrive at her friend's house, which was across town. Once at his house,

Murray testified, Tefteller did not object when he put his hand on her leg on the front porch, and Tefteller agreed to accompany him to his bedroom. According to Murray, once in the bedroom the two engaged in consensual necking and then attempted intercourse. Murray states that when he could not maintain an erection Tefteller goaded him by suggesting he try wrapping his duct tape around his penis and by making other comments deprecating his manhood. Murray admitted he wrapped the duct tape around Tefteller's head and mouth in a fit of rage over her comments. He admitted he accidentally hit Tefteller's lip with his hand when wrapping the tape. He states he immediately apologized, carefully removed the tape, dabbed some blood from Tefteller's bruised lip, and let her leave with Patow. He testified Tefteller screamed only once, in anger, when he removed the tape.

Informed of Tefteller's allegations of rape and that Murray had an "arsenal" at his house, police arrested Murray without a warrant at Murray's house early that evening. As a consequence of the arrest, police obtained photographs of minor injuries to Murray's chest and knuckles. Police conducted no search at the time of arrest.

During her closing argument at Murray's trial, the prosecuting attorney made the following comment:

MS. FIELD-LANG: It's quite interesting, as you watch the course of the evidence develop, that Mr. Murray was able to sit here and listen to everyone testify. He had records of all the witnesses' statements.

Denise Tefteller was not or did not have that information available to her. Nor did any of the other witnesses who testified.

Denise Tefteller first told her story to the doctor—or, excuse me, to the police at Dory and Dave Patow's house, and then to the doctor, and her story is consistent.

She told her story again to Detective Frankenhauser and again to Detective Pam Cercek. Every time, it was recorded on tape and every time it was the same story.

Of course, Mr. Murray, you see, didn't tell his story until five months of contemplating, listening to all of the witnesses—

MR. WITEK: Your honor, I want to object here. Objection.

THE COURT: All right.

MR. WITEK: I think counsel is discussing my client's Fifth Amendment privilege to remain silent following arrest, and it's clearly improper.

THE COURT: All right. I think you better rephrase your argument, counsel.

Jury will disregard that comment.

Even after being admonished by the trial judge, the prosecutor concluded her theme:

> MS. FIELD-LANG: And keep in mind, when he sat there on the witness stand, he had every reason to lie.
>
> Did you notice how, when he thought that another witness had testified to the same thing he did, other than Denise Tefteller, he kind of said the same thing as that witness did?

## LEGAL DISCUSSION

### I. *Legality of the Warrantless Arrest*

Murray first assigns as error the district court's ruling that exigent circumstances existed which justified the warrantless arrest of Murray at his house. We disagree.

The fourth amendment of the U.S. Constitution prohibits warrantless felony arrests at a suspect's home absent consensual entry or exigent circumstances. Payton v. New York, 445 U.S. 573, 576 and 588-89 (1980). The exigent circumstances doctrine authorizes a warrantless felony arrest in the suspect's residence if the police have reasonable grounds to believe there is an urgent need to preserve life by entry or an urgent need to launch a criminal investigation involving a substantial threat of imminent danger to life, health or property. Banks v. State, 94 Nev. 90, 96-97, 575 P.2d 592, 596 (1978). "The search, however, must not be a *planned* warrantless search with an accompanying intent either to arrest or obtain evidence." Johnson v. State, 97 Nev. 621, 624, 637 P.2d 1209, 1211 (1981). Murray's arrest was not accompanied by a planned warrantless search. Officers conducted no search until hours after the arrest. The later search was pursuant to a search warrant.

Exigent circumstances generally exist where police are in hot pursuit of a person who is allegedly armed and who allegedly committed a violent felony. *See Johnson, supra;* U.S. v. Davis, 785, F.2d 610 (8th Cir. 1970). Here, police arrested Murray in immediate response to allegations that Murray had committed a violent felony at a house filled with other people and that Murray had an "arsenal" at the house. Under *Johnson* and *Davis,* therefore, exigent circumstances existed to justify the warrantless arrest of Murray at his home.

### II. *Prosecutorial Misconduct*

Murray argues that the prosecutor's comment during closing argument constituted prosecutorial misconduct which violated

Murray's rights against self-incrimination and to a fair trial. We agree. In its answering brief, respondent admits: "Frankly, it is difficult to defend this comment on its merits." The purpose of the comment was to diminish Murray's credibility as a witness. The comment suggested that the only reason Murray's story seemed at all credible was because Murray could remain silent during trial and listen to the testimony of other witnesses; then Murray could fabricate a story consistent with the other testimony before he had to testify. This court has held violative of a defendant's rights a strikingly similar comment made during closing argument. *See* Aesoph v. State, 102 Nev. 316, 721 P.2d 379 (1986). This court has reversed other convictions for improper references by prosecutors to a defendant's right to post-arrest silence. *See* Mahar v. State, 102 Nev. 488, 728 P.2d 439 (1986); McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984) (involving the same District Attorney's Office which prosecuted the present case).

We conclude that the error caused by the prosecutor's comment was harmful, mandating reversal of Murray's conviction. To be considered harmless, error caused by a prosecutor's improper references to the defendant's right to post-arrest silence must be harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967). Our analysis must be to determine whether the evidence against Murray was so conclusive that we can declare the prosecutor's remark harmless beyond a reasonable doubt.

The evidence against Murray in this case is not overwhelming. Little physical evidence exists to corroborate Tefteller's claim of lack of consent. A full pelvic exam on Tefteller the same day turned up no trauma inconsistent with consensual intercourse. The only injury to Tefteller observed by witnesses was her slightly bleeding lip, which is consistent with Murray's account. A witness testified that scratches on Murray's chest were minor and, again, might have been consistent with consensual intercourse. Although Tefteller testified she suffered permanent scarring in her mouth from having Murray's hand stuck down her throat, no other evidence supports this testimony. The "nicks" on Murray's knuckles were as consistent with Murray's claim that he nicked his knuckles on sheet metal at work as with Tefteller's claim that she bit him. In their later search of the house, police found no discarded tampon and no knife or shotgun. The officers found only a piece of duct tape. The duct tape is consistent with either Murray's or Tefteller's accounts. Murray's testimony that he had a tantrum and silenced Tefteller with the

tape when Tefteller insulted his manhood with her reference to the tape is not incredible beyond a reasonable doubt. This is especially true in light of the facts that Murray had been drinking and had been awake for twenty-four hours.

The testimony of people at Murray's house gave little support to Tefteller's assertion of lack of consent. These people testified they heard only one, not three screams. None believed the scream or other sounds coming from the bedroom indicated anyone was in any danger. One witness testified that the single scream was in anger, consistent with Murray's testimony. Finally, another witness testified that he heard Tefteller and Murray talking in conversational tones when he knocked on the bedroom door. All this testimony tends to contradict Tefteller's testimony that she screamed each time someone knocked on the door.

The fact that soon after she arrived at Murray's house Tefteller arranged by phone to meet Patow at the convenience store is not overwhelming evidence that Murray forced her to remain. Tefteller had been drinking and she had fifteen to thirty minutes to wait before returning to the store to meet Patow. Moreover, there is no indication on the record that anyone told Patow the address of Murray's house, which was across town from Patow's house. Regardless of whose version of the events is true, Tefteller must have been surprised, either pleasantly or unpleasantly, to see Patow at the bedroom door. Murray testified he believed Tefteller fabricated the rape story to prevent her husband from discovering her infidelity. This is a plausible motive for fabrication.

Absent strong physical or circumstantial evidence of sexual assault, this case turned on the only direct evidence on the issue of consent, Murray's and Tefteller's testimony. Murray's credibility was crucial to his defense. In its answering brief, the State admits as much by characterizing the case as a "swearing contest." Moreover, at oral argument the State conceded the case had been close and had hinged in large part on Murray's and Tefteller's credibility. The jurors apparently considered the case to be close as well, since their deliberations lasted seven hours.

The prosecutor's comment stripped Murray's testimony of any credibility it may have had with the jurors. If any of the jurors had doubts based on consistencies between the testimony of Murray and other witnesses, the comment dispelled those doubts. The Deputy District Attorney's message was clear: Murray's testimony rang true only because, unlike Tefteller, Murray had had time to fabricate his story by waiting until the other witnesses had testified; Murray was a liar with an unfair advantage.

In *Aesoph,* this court concluded that a similar comment made by the prosecutor, standing alone, was harmful error because

Aesoph's credibility was an important issue in that case. *See Aesoph, supra,* 102 Nev. at 322, 721 P.2d at 383. Murray's credibility was a vital issue in this case. As in *Aesoph,* then, the prosecutorial misconduct in this case mandates reversal. Indeed, this court generally has considered illegal attacks on parties' credibility to be harmful error in criminal cases where the evidence against the party is not overwhelming or the credibility of the party is an important issue. *See, e.g.,* Mahan v. State, 104 Nev. 13, 752 P.2d 208 (1988) (holding that prosecutor's inaccurate statement that defendant's fingerprints matched prints found at the crime scene was harmful error because evidence against defendant was not overwhelming); Winiarz v. State, 104 Nev. 43, 752 P.2d 761 (1988) (holding that a statement by a psychiatrist that defendant's defense of accident was a lie was harmful error in murder appeal because defendant's credibility on the issue of accident was vital to the state's case).

In conclusion, because Murray's credibility was an important issue and the evidence against Murray was not overwhelming, the prosecutor's comment infected the trial with harmful error.

Because the prosecutorial misconduct in this case mandates reversal, we need not reach Murray's other claims of error.

We conclude that the prosecutorial conduct in this case constitutes harmful error. Accordingly, we reverse Murray's conviction and remand for a new trial.