142 Nev., Advance Opinion 20

IN THE SUPREME COURT OF THE STATE OF NEVADA

RUBEN ARTURO MATADAMAS-
SERRANO,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 88527

**FILED**

MAR 05 2026

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to jury verdict, of one count of first-degree murder with use of a deadly weapon and one count of burglary while in possession of a deadly weapon. Eighth Judicial District Court, Clark County; Carli Lynn Kierny, Judge.

*Affirmed.*

F. Virginia Eichacker, Special Public Defender, and Amy Yonesawa and Quintin Dollente, Jr., Chief Deputy Special Public Defenders, Clark County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Karen Mishler, Chief Deputy District Attorney, and Rachel Krumm, Deputy District Attorney, Clark County,
for Respondent.

---

BEFORE THE SUPREME COURT, EN BANC.

26-10352

## *OPINION*

By the Court, PICKERING, J.:

Appellant Ruben Matadamas-Serrano was convicted of first-degree murder and a related burglary charge for fatally stabbing his girlfriend, Maribel Garibay. He argues his convictions should be overturned for *Batson* error, Confrontation Clause violations, evidentiary error, and cumulative error. We find no reversible error and affirm.

I.

Matadamas-Serrano and Garibay had been in a long-term, on-and-off relationship. Both were undocumented immigrants, and in 2018, Matadamas-Serrano was deported. Before Matadamas-Serrano returned to the United States, Garibay married Abel Aguilar.

On the night of the stabbing, Matadamas-Serrano came to visit Garibay at the property where she resided with Aguilar. Matadamas-Serrano was drunk and soon left. He returned an hour or so later, still drunk, and found Garibay with Aguilar in the property's casita. The two men got into a fistfight. Aguilar knocked Matadamas-Serrano down and then went to wash his hands in the bathroom. When he emerged, Matadamas-Serrano ran at him with a knife. Aguilar locked himself in the bathroom and called 911. While on the call, Aguilar heard Garibay say Matadamas-Serrano was stabbing her. After Matadamas-Serrano left, Aguilar came out and found Garibay leaning against the wall, holding her throat, which had been cut. Officers apprehended Matadamas-Serrano in his car at a desert lot, where he had collided with a concrete bunker. Matadamas-Serrano was covered in blood, and he told officers he had stabbed his wife, who had been lying to and cheating on him. Garibay later died of her injuries.

SUPREME COURT
OF
NEVADA

(O) 1947A

2

The State charged Matadamas-Serrano with murder with use of a deadly weapon and burglary while in possession of a deadly weapon, and the case proceeded to trial. During jury selection, after for-cause challenges were resolved, the State used five of its eight peremptory challenges to strike venire members belonging to three different ethnic or racial minority groups. Matadamas-Serrano objected pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court compared this ratio to the racial mix of the group of 30 venire members against whom the strikes were made. Based on that comparison, it concluded that Matadamas-Serrano had not met his burden on the first step of *Batson*, which requires a prima facie showing of race-based discrimination. It therefore denied his *Batson* challenge at step one, without proceeding through *Batson*'s second and third steps. As empaneled, the jury consisted of 12 jurors and two alternates, half of whom identified as Caucasian and half as racial or ethnic minorities.

Matadamas-Serrano filed a motion in limine seeking to exclude testimony from Dr. Stacey Simons, a coroner who did not conduct Garibay's autopsy, but who had reviewed photographs of Garibay's wounds, hospital records, and the autopsy report. The district court denied the motion, ruling that the substitute coroner could testify to "their own findings, conclusions, and opinions based on the autopsy photos." At trial, over Matadamas-Serrano's renewed objection, Dr. Simons used the photographs to explain the path of Garibay's stab wounds. She opined that Garibay had died of complications from those injuries. In addition to Dr. Simons' testimony, the State presented testimony by law enforcement and the audio recording of Aguilar's 911 call, providing the jury with a transcript of the call as a listening aid.

Matadamas-Serrano did not contest that he had stabbed Garibay or that she had died as a result. Instead, he argued that he had been too intoxicated to commit first-degree murder, which requires either premeditation and deliberation or the specific intent needed to establish burglary as a predicate to felony murder. To that end, he presented testimony by Dr. Pohl, an expert in addiction medicine. The district court generally allowed the testimony but with limitations. Matadamas-Serrano also sought to introduce Aguilar's preliminary hearing testimony into evidence. Over Matadamas-Serrano's objection, the court redacted some portions before admitting the preliminary hearing transcript.

## II.

On appeal, Matadamas-Serrano alleges the district court improperly denied his *Batson* challenge, violated his Sixth Amendment right to confront witnesses by allowing the substitute coroner to testify and by redacting portions of Aguilar's preliminary hearing testimony, improperly limited Dr. Pohl's expert testimony, and erred by allowing the jury to review the State's transcript of the 911 call. He further argues cumulative error warrants reversal. As explained below, none of these arguments establishes a basis for reversing the judgment of conviction in this case.

## A.

Matadamas-Serrano contends that the district court erred by rejecting his *Batson* challenge at step one and should instead have proceeded through all three of *Batson*'s steps before making its decision. He further contends that the district court should not have allowed the State to argue against the prima facie showing he assertedly made at step one.

The Equal Protection Clause prohibits a party from using peremptory challenges to strike "potential jurors solely on account of their

SUPREME COURT
OF
NEVADA

(O) 1947A

race." *Batson*, 476 U.S. at 89. When a defendant objects that a peremptory challenge is race-based, *Batson*'s three-step framework applies. *Cooper v. State*, 134 Nev. 860, 861, 432 P.3d 202, 204 (2018); *see Batson*, 476 U.S. at 93-100. First, defense counsel must make a prima facie showing that the State exercised the peremptory challenge(s) based on race. *Williams v. State*, 134 Nev. 687, 689, 429 P.3d 301, 305 (2018). Second, if that showing is made, the State may present a race-neutral explanation for the challenged strike(s). *Id.* at 689, 429 P.3d at 306. Third, and finally, the district court must determine whether the defense has shown purposeful discrimination. *Id.* The district court is not required to proceed to the second and third steps unless the opponent of the strike(s) satisfies the first step. *Watson v. State*, 130 Nev. 764, 775-79, 335 P.3d 157, 166-69 (2014); *accord Barlow v. State*, 138 Nev. 207, 217-18, 507 P.3d 1185, 1197 (2022). This court reviews the district court's *Batson* findings deferentially and "will not reverse the district court's decision unless clearly erroneous." *Watson*, 130 Nev. at 775, 335 P.3d at 165 (internal quotation omitted); *accord Barlow*, 138 Nev. at 218, 507 P.3d at 1197.[1]

At step one, the party raising the *Batson* challenge must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93-94). "This standard is not onerous and does not require the opponent of the strike to meet his or her ultimate burden of

---

[1]As noted in *Watson*, 130 Nev. at 775 n.2, 335 P.3d at 166 n.2, the federal courts are split as to the standard of review that applies to the prima facie determination that is *Batson*'s first step. We do not address the split because the parties to this appeal do not question the clear-error standard our caselaw applies at all three *Batson* steps. *Id.*; *see Cooper*, 134 Nev. at 861 n.2, 432 P.3d at 204 n.2.

proof under *Batson*." *Watson*, 130 Nev. at 775, 335 P.3d at 166 (citing *Johnson*, 545 U.S. at 170). But "the mere fact that the State used a peremptory challenge to exclude a member of a cognizable group is not, standing alone, sufficient to establish a prima facie case under *Batson*'s first step; 'something more' is required." *Id.* at 776, 335 P.3d at 166. Although "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination," *Batson*, 476 U.S. at 97, "a pattern is not the only way to satisfy step one," *Cooper*, 134 Nev. at 862, 432 P.3d at 205. In addition to a pattern of strikes against members of a targeted group, "circumstances that might support an inference of discrimination include, but are not limited to, the disproportionate effect of peremptory strikes, the nature of the proponent's questions and statements during voir dire, disparate treatment of members of the targeted group, and whether the case itself is sensitive to bias." *Watson*, 130 Nev. at 776, 335 P.3d at 166-67.

In district court, Matadamas-Serrano based his *Batson* challenge on the State's use of five of its eight peremptory strikes against venire members who identified as members of any racial or ethnic minority, not members of a single minority. At the time the strikes were exercised, the prospective jurors had been passed for cause, leaving 30 venire members, 12 of whom identified as racial or ethnic minorities and 18 who identified as Caucasian or white.[2] The State's strikes removed two African Americans, one Asian, two Hispanics, and three Caucasians. The defense

---

[2]These numbers are drawn from the errata Matadamas-Serrano filed before oral argument in this case, correcting the slightly different numbers used in his opening and answering briefs. The State did not object to the corrections.

also exercised eight strikes, all against Caucasians. The record does not show how the composition of the group shifted each time the State and the defense made their alternating strikes. It does show, however, that the empaneled jury consisted of 12 jurors and two alternates, seven of whom identified as racial or ethnic minorities—including an African American, an Asian, and three, possibly four Hispanics—and seven of whom identified as Caucasian. Expressed in terms of percentages, after for-cause challenges, the State exercised 62.5% of its peremptory challenges (5 of 8) to remove 41.6% of the venire members who identified as racial or ethnic minorities (5 of 12), which, when the peremptory-strike process began, comprised 40% of the venire members (12 of 30), and when it concluded, produced a jury that, counting the alternates, consisted of 50% racial or ethnic minorities and 50% Caucasians (7/7 of 14).

The district court did not clearly err when it denied Matadamas-Serrano's *Batson* challenge at step one. The defense largely based its *Batson* challenge on the State having used five out of its eight peremptory challenges against venire members who identified as racial or ethnic minorities. But "[m]erely identifying minority venire members struck by the State does not meet the burden of showing an inference of discriminatory purpose." *Barlow*, 138 Nev. at 217-18, 507 P.3d at 1197 (holding that the fact the State used four peremptory challenges to remove minorities is not, without more, sufficient to move past step one); *Watson*, 130 Nev. at 779, 335 P.3d at 168 (concluding that "the State's use of six of its nine peremptory challenges against women, standing alone, was not sufficient to give rise to an inference of discrimination"). This is because "the raw number of peremptory challenges used against targeted-group members is meaningless without some point of reference." *Watson*, 130

SUPREME COURT
OF
NEVADA

(O) 1947A

7

Nev. at 777, 335 P.3d at 167 (quoting Kenneth J. Melilli, *Batson in Practice: What We Have Learned About Batson and Peremptory Challenges*, 71 Notre Dame L. Rev. 447, 476 (1996)). The ratio between the number of strikes the State made against targeted-group members and the total number of peremptory strikes it made provides one point of reference, but "[t]hat point of reference has little meaning . . . without additional information such as the number of targeted-group members remaining in the venire after the for-cause challenges." *Id.*

As noted above, the State exercised 62.5% of its peremptory strikes to remove 41.6% of the minorities, who comprised 40% of the venire remaining when the peremptory strike process began. This disparity is close to though somewhat greater than that in *Watson*, where the State used 67% of its strikes against women, who constituted 56% of the venire after the for-cause challenges, and we affirmed the district court's decision to reject the defendant's *Batson* challenge at step one. *Id.* at 778-79, 335 P.3d at 168. However, the disparity is less than that in *Cooper*, where the State used 40% of its peremptory challenges to remove 67% of the African Americans who made up just over 13% of the venire, and we reversed the decision to reject the *Batson* challenge at step one. *Cooper*, 134 Nev. at 865, 432 P.3d at 207. During voir dire in *Cooper*, though, the State asked the venire about their opinions on the Black Lives Matter movement, a question with race-based implications that had "at best, minimal relevance," making it "particularly problematic" that the district court did not proceed to step two and ask the State the reasons for its disproportionate strikes. *Id.* at 864-65, 432 P.3d at 206-07.

The *Batson* challenge in this case rested on the peremptory challenge percentages and did not present the added component of the State having singled out individuals who identified as racial or ethnic minorities with marginally relevant race-sensitive questions and statements during voir dire. The disparity in the percentages shifted as the strikes progressed, because the defense used all eight of its strikes on Caucasians to the point that the percentage of minorities increased from 40% to 50% by the time the parties completed their strikes. *See Watson*, 130 Nev. at 778-79, 335 P.3d at 168 (noting that the shift in percentage composition of the venire due to defense strikes is a relevant point of reference to consider in evaluating the step one showing) (citing *United States v. Martinez*, 621 F.3d 101, 110-11 (2d Cir. 2010)); *cf. United States v. Hernandez-Quintania*, 874 F.3d 1123, 1129 (9th Cir. 2017) (considering the empaneled jury's racial makeup as one factor in addressing step one). On this record, we cannot say that the district court clearly erred in overruling the *Batson* challenge at step one.

Matadamas-Serrano makes two additional arguments, neither of which carries. First, he contends that the district court erred when it allowed the State to argue that its use of five out of eight of its peremptory strikes did not legally establish the prima facie showing required to move past step one. The district court acknowledged Matadamas-Serrano's percentage-based challenge, then said, "however, at this time, I'm going to—" when the State interrupted and asked to make a record. At that point, the State argued the additional reference points recognized in *Watson* and the cases just discussed, on which the defense was also heard. The district court shared its record of how the venire members identified their race or ethnicity with the parties, then overruled the *Batson* challenge at step one. Matadamas-Serrano cites no authority that prohibits argument from both

SUPREME COURT
OF
NEVADA

(O) 1947A

9

sides on whether the step one showing has been made. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) ("It is appellant's responsibility to present relevant authority and cogent argument; issues not so presented need not be addressed by this court."). Matadamas-Serrano's second argument—that he is Hispanic and his immigration status was an issue in this case that should have been considered at step one—likewise fails, because he does not support it with authority or cogent argument in his opening brief. *Id.*

## B.

Matadamas-Serrano next argues the district court violated his confrontation rights by allowing a coroner who did not perform the autopsy to testify at trial. Relying on *Smith v. Arizona*, 602 U.S. 779 (2024), he contends that one expert may not, in support of her opinion, convey another nontestifying expert's statements, and that Dr. Simons improperly testified to the coroner's pathology report and used that report to form her opinion and refresh her recollection. He also contends the statements in the pathology report were both testimonial in nature and hearsay as used at trial. Though typically we apply discretionary review to the district court's evidentiary rulings and rulings on a motion in limine, we review de novo whether a defendant's Confrontation Clause rights were violated. *See Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009); *Whisler v. State*, 121 Nev. 401, 406, 116 P.3d 59, 62 (2005).

The Confrontation Clause bars "the testimonial statement of an otherwise unavailable witness . . . unless the defendant had an opportunity to previously cross-examine the witness regarding the witness's statement." *Polk v. State*, 126 Nev. 180, 183, 233 P.3d 357, 359 (2010) (quoting *Medina v. State*, 122 Nev. 346, 353, 143 P.3d 471, 476 (2006)). We have previously determined that a substitute coroner's independent opinion, based on their

SUPREME COURT
OF
NEVADA

(O) 1947A

10

own review of the crime photographs and autopsy report, does not offend the defendant's confrontation rights so long as the expert does not effectively introduce testimonial hearsay into evidence, such as by quoting the autopsy report. *See Flowers v. State,* 136 Nev. 1, 8-9, 456 P.3d 1037, 1045 (2020).

The United States Supreme Court's plurality opinion in *Williams* indicated that an expert could recite a lab analyst's findings for "the legitimate nonhearsay purpose of illuminating the expert's thought process." *Williams v. Illinois,* 567 U.S. 50, 78 (2012). This led to widespread confusion over whether such testimony violated the Confrontation Clause. *Smith,* 602 U.S. at 789. The Supreme Court clarified this issue in *Smith.* There, the State sent items seized on a search warrant to a crime lab for analysis, noting the name of the accused and the upcoming trial in its request to the lab. *Id.* at 789-90. Prosecutors had also communicated with the lab analyst about which items needed testing. *Id.* at 790. The lab analyst prepared notes and a report, documenting her lab work and results showing that the seized drugs included methamphetamine, marijuana, and cannabis. *Id.* But because that analyst was unavailable for trial, a substitute analyst testified instead, relying on the absent analyst's records to describe the testing method and opine as to the test results. *Id.* at 790-91.

On review, the Supreme Court held that "[w]hen an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Id.* at 783. The Court reiterated that the Confrontation Clause applies to testimonial hearsay—to testimonial statements that come into evidence for their truth. *Id.* at 792-93. In that

case, the testifying analyst had necessarily "accepted the truth of what the [absent analyst] had reported about her work in the lab," and "the jury could credit [the absent analyst's] opinions identifying the substances only because it too accepted the truth" of the lab reports. *Id.* at 798. Though the testifying analyst could fairly opine as to how the lab functioned, testify generally about forensic guidelines and techniques, or even answer hypothetical questions about conclusions he could draw if an out-of-court statement were true, the testifying analyst could not be used to "relay what [the absent analyst] wrote" or become a "mouthpiece" for her at trial. *Id.* at 798-800. But because the state court had not decided whether the absent analyst's statements were testimonial, the Supreme Court remanded for that court to make the determination in the first instance. *Id.* at 801-02.

Smith clarified that "courts cannot make an end run around the Confrontation Clause by claiming the underlying facts are only being offered to explain an independent opinion." *Busby v. State*, 422 So. 3d 974, 978 (Miss. 2025) (explaining *Smith*'s holding); *see also Roalson v. Noble*, 116 F.4th 661, 666 n.1 (7th Cir. 2024) (explaining that in *Smith* the testifying analyst problematically testified to the truth of the absent analyst's report). *Smith* does not, however, impose a categorical rule that a substitute expert may not testify or that any degree of exposure to testimonial hearsay necessarily renders the testifying expert's opinion inadmissible. Rather, "*Smith* addresses the admissibility of the *basis* for an expert's opinion—not the opinion itself." *Commonwealth v. Gordon*, 266 N.E.3d 369, 399 (Mass. 2025) (Georges, J., concurring); *see also Smith*, 602 U.S. at 783. The substitute expert's testimony will therefore be inadmissible if the expert is merely a conduit for another analyst's testimonial statements, or if the expert both relies on and conveys those absent analyst's testimonial

statements in support of their opinion. *Id.* But if the record shows the expert's opinion is meaningfully independent and not based on testimonial hearsay, it will not violate the Confrontation Clause even where the expert may have reviewed another expert's report in preparation for trial. *See, e.g., Jeremias v. State*, 134 Nev. 46, 54, 412 P.3d 43, 51 (2018) (concluding that a substitute coroner's testimony did not violate the Confrontation Clause where she testified to the independent conclusion she had formed based on photographs); *Vega v. State*, 126 Nev. 332, 340, 236 P.3d at 632, 638 (2010) (concluding the expert could offer an independent opinion based on her review of a video recording and diagram); *see also Gordon*, 266 N.E.3d at 400-01 (Georges, J., concurring) (focusing "on whether the testifying expert's opinion is meaningfully independent, based on the totality of the information reviewed," and listing cases allowing testifying experts to form conclusions based on "raw data").

Statements are testimonial when they "would lead an objective witness to reasonably believe that the statements would be available for use at a later trial." *Medina*, 122 Nev. at 354, 143 P.3d at 476 (citation modified); *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (explaining that statements are testimonial where "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution"). Whether autopsy reports are testimonial is a subject of debate. *See* Carolyn Zabrycki, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement*, 96 Calif. L. Rev. 1093, 1093-94 (2008); *cf. State v. Maxwell*, 9 N.E.3d 930, 950 (Ohio 2014) (concluding autopsy reports are created primarily to document the cause of death for the public records and public health, and are therefore nontestimonial); *State v. Bass*, 132 A.3d

1207, 1225 (N.J. 2016) (concluding the autopsy report was testimonial where the autopsy was conducted in the presence of two law enforcement officers shortly after the shooting, and the medical examiner transmitted collected evidence to an investigator). Nevada law has not addressed whether autopsy reports are generally nontestimonial or may be testimonial when considered in context, and the parties do not provide sufficient information about Nevada's rules regarding autopsies or the circumstances surrounding Garibay's autopsy to determine that point here.

Regardless, we need not resolve that question. Even assuming *arguendo* the autopsy report was testimonial, Matadamas-Serrano fails to show a Confrontation Clause violation on this record. Though Dr. Simons acknowledged she had reviewed the autopsy report, she also reviewed and relied on the hospital records and photographs of the victim's wounds. Notably, in denying Matadamas-Serrano's motion in limine to bar the substitute coroner, the district court instructed that the substitute coroner could testify to her own "opinions based on the autopsy photos," which were admitted into evidence and are nontestimonial. *Cf. People v. Nadey*, 555 P.3d 961, 1009 (Cal. 2024) (explaining testimony based on autopsy photographs does not violate the Confrontation Clause because "photographs [are] not hearsay"); *People v. Leon*, 352 P.3d 289, 314 (Cal. 2015) (explaining photographs are not testimonial statements and that "the admission of autopsy photographs, and competent testimony based on such photographs, does not violate the confrontation clause") (emphasis added). The record shows that Dr. Simons relied on those photos as the basis for the findings and opinion she expressed to the jury. Consistent with the district court's ruling on the pretrial motion in limine, the record does not show that Dr. Simons' testimony depended on the truth of the original autopsy report

or that she merely conveyed the absent expert's testimonial statements, as was problematic in *Smith*.

But even had the district court erroneously admitted some testimonial hearsay, that error would have been harmless beyond a reasonable doubt. Dr. Simons testified that Garibay had been stabbed and that those wounds caused significant blood loss, leading to her death. And Matadamas-Serrano did not contest that he fatally stabbed Garibay. Accordingly, any error on this point would not be reversible. *See Polk*, 126 Nev. at 184, 233 P.3d at 359 (explaining a *Crawford* violation will be harmless if the State can show beyond a reasonable doubt the error did not contribute to the verdict).

C.

Next, Matadamas-Serrano complains that when the district court allowed him to read Aguilar's preliminary hearing testimony into the record, it improperly "allowed the State to make new objections" and then "redacted the preliminary hearing transcript based on those new rulings" instead of concluding, as it should have done, that "the State's new objections were waived because they were not contemporaneously made in the justice court." *See* NRS 51.325 (if the witness is unavailable at trial, their preliminary hearing testimony is admissible). Matadamas-Serrano argues this violated his Confrontation Clause rights, as those "redactions negated the defense's opportunity to effectively cross-examine [Aguilar] because the defense had no opportunity to rephrase its questions or ask different questions in light of the court's rulings on the State's new objections," and that while "the complete preliminary hearing transcript could have been used to attack [Aguilar's] credibility, . . . the redactions limited the defense's ability to do that at trial."

Our caselaw does not address how the contemporaneous objection rule applies in this context, *cf. Riddle v. State*, 96 Nev. 589, 591, 613 P.2d 1031, 1033 (1980) (noting that generally a contemporaneous objection is needed to preserve an issue for appeal). Assuming it applies, Matadamas-Serrano does not identify what redacted portions he believes were improperly excluded, much less show that their exclusion violated the Confrontation Clause. Nor does he explain why the redactions harmed his ability to attack Aguilar's credibility in view of the portions that were admitted. *See Jeremias*, 134 Nev. at 59, 412 P.3d at 54 (this court may decline to consider arguments that are not supported by cogent argument); *Morrison v. State*, 140 Nev., Adv. Op. 24, 548 P.3d 431, 441 (Nev. Ct. App. 2024) (faulting defendant for failing to cite portions of the record supporting his argument, as required by NRAP 28(e)(1)). Nevertheless, having reviewed the admitted transcript, which includes Matadamas-Serrano's cross-examination about gaps in Aguilar's memory of the crime, his questions about Aguilar's short-term memory loss and PTSD, and instances of Aguilar bristling at questions and being uncooperative, we conclude Matadamas-Serrano fails to show the district court erred by redacting the transcript. *Cf. State v. Eighth Jud. Dist. Ct. (Baker)*, 134 Nev. 104, 106-07, 412 P.3d 18, 21-22 (2018) (explaining the conditions that must be met before a preliminary hearing transcript may be used at trial and reviewing the trial court's decision for an abuse of discretion). Moreover, under these facts any error would be harmless. *See Polk*, 126 Nev. at 184, 233 P.3d at 359 (noting any error will be harmless if the State can show beyond a reasonable doubt that the error did not contribute to the verdict).

## D.

Matadamas-Serrano contends that the district court committed evidentiary and constitutional error because it did not allow his addiction specialist, Dr. Pohl, to testify that Matadamas-Serrano was so intoxicated he could not have formed the specific intent required for first-degree murder. "A district court's decision to admit or exclude evidence is reviewed on appeal under an abuse-of-discretion standard." *Collins v. State*, 133 Nev. 717, 724, 405 P.3d 657, 664 (2017). But "whether an evidentiary error rises to the level of a constitutional violation" presents a legal question that we review de novo. *United States v. Pineda-Doval*, 614 F.3d 1019, 1032-33 (9th Cir. 2010).

Voluntary intoxication does not excuse criminal conduct. NRS 193.220. It may negate the specific intent required for first-degree murder, however, thereby reducing the degree of the crime. *Id.*; *see King v. State*, 80 Nev. 269, 271-72, 392 P.2d 310, 311 (1964) (recognizing that intoxication may prevent the premeditation and deliberation needed for first-degree murder); *Tucker v. State*, 92 Nev. 486, 488-89, 553 P.2d 951, 952-53 (1976) (recognizing that intoxication may defeat the specific intent required for burglary as a predicate to felony murder). These principles derive from NRS 193.220, which states:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of the person's intoxication may be taken into consideration in determining the purpose, motive or intent.

Whether voluntary intoxication negates the specific intent needed to commit certain crimes "is normally a fact issue for the jury to resolve." *King*, 80 Nev. at 272, 392 P.2d at 311; *Tucker*, 92 Nev. at 489, 553 P.2d at 952. As such, it may be the subject of expert testimony, *see* NRS 50.275 (providing that a qualified expert may testify when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue"), so long as the evidence is "otherwise admissible," NRS 50.295, and the witness "does not stray from [qualified expert opinions] about factual matters to conclusions about the appropriate verdict," *Pundyk v. State*, 136 Nev. 373, 378, 467 P.3d 605, 609 (2020), or "give a direct opinion on the defendant's guilt or innocence in a criminal case," *Collins*, 133 Nev. at 724, 405 P.3d at 664.

At trial, Matadamas-Serrano presented testimony from Dr. Pohl to establish his intoxication defense to first-degree murder. Dr. Pohl interviewed Matadamas-Serrano, who told him he blacked out and had no memory of the crime, and reviewed video footage and hospital records establishing his extreme intoxication the night it occurred. Because Matadamas-Serrano did not testify at trial, the district court sustained the State's hearsay objection to Dr. Pohl relating what Matadamas-Serrano told him about blacking out. Through Dr. Pohl, however, the jury learned that (1) Matadamas-Serrano was extremely intoxicated when the crime occurred, as evidenced by a video showing him passed out in his car about an hour beforehand and a blood-alcohol level of .276 two hours afterwards; (2) this level of intoxication impairs judgment, coordination, impulse-control, and memory—"the thinking, judging, remembering, deciding part of the brain,"—and can cause blackouts; (3) in a blackout, a person "can't record memory. And if you are unable to record memory, it's impossible to

decide to do something and follow through on that decision, which is, as I understand, at the basis of intent." In closing argument, the defense relied on Dr. Pohl's testimony to argue that Matadamas-Serrano's intoxication put him in a blackout state such that he could not and did not premeditate or deliberate, as required for first-degree murder, or act with the specific intent required for burglary, which was the predicate to the felony-murder charge.

During Dr. Pohl's testimony, the State objected that he should not be allowed to testify to legal conclusions or to give opinions as to guilt or innocence. The district court heard argument outside the presence of the jury and partially sustained these objections. It ruled that the defense could ask Dr. Pohl whether "the level of intoxication that you've testified to [could] affect a person's ability to form specific intent," including whether "in his opinion, could the level of his intoxication that he's already testified to, the .276, have affected the ability of Ruben Matadamas[-Serrano] to form a specific intent." Dr. Pohl was then asked and answered the question(s) the district court authorized.

Citing *Pundyk*, 136 Nev. at 375-76, 467 P.3d at 607-08, Matadamas-Serrano argues that "Dr. Pohl should have been permitted to testify [directly] to whether Ruben [Matadamas-Serrano] was able to form specific intent." In *Pundyk*, the defendant pleaded not guilty by reason of insanity (NGRI) and sought to introduce expert opinion testimony about his mental state, specifically, that "he failed to appreciate the wrongfulness of his conduct due to a delusional state." *Id.* at 375, 467 P.3d at 607. The district court excluded the evidence. Reversing, we held that NRS 50.295 allows expert testimony on a defendant's mental state equally with any other ultimate issue of fact, so long as the expert does not offer a direct

SUPREME COURT
OF
NEVADA

(O) 1947A

19

opinion on the defendant's guilt or innocence. *Id.* at 376, 467 P.3d at 608. In doing so, we overruled our decision in *Winiarz v. State*, 104 Nev. 43, 51 n.6, 752 P.2d 761, 766 n.6 (1988), which purported to incorporate FRE 704(b) into Nevada law. Like FRE 704(a), NRS 50.295 declares that opinion evidence is not objectionable because it embraces an ultimate issue. FRE 704(b) creates an exception to FRE 704(a), providing that an expert in a criminal case may not testify that the defendant "did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." But because Nevada's evidence code omits the FRE 704(b) exception, *Pundyk* concluded that judicially adding it as *Winiarz* did "is contrary to NRS 50.295." 136 Nev. at 377 n.2, 467 P.3d at 608 n.2.

The State argues that *Pundyk* is limited to NGRI pleas, but we disagree. The part of *Winiarz* that *Pundyk* overruled did not concern an NGRI plea but testimony that the defendant did not premeditate or deliberate the killing because he was too drunk to form such intent. *Id.* at 376-77, 467 P.3d at 608 (citing *Winiarz*, 104 Nev. at 50-51, 752 P.2d at 766). Such testimony, *Pundyk* held, was admissible under NRS 50.295. *Id.* While *Pundyk* recognized that the testimony in *Winiarz* that went beyond premeditation and deliberation to state that the defendant "murdered her husband in cold blood" was properly excluded because it was prejudicial and an improper opinion on the defendant's guilt or innocence, its holding permitting expert testimony on the effect a defendant's intoxication had on their capacity to premeditate or deliberate applies here.

We therefore conclude, based on *Pundyk*, that the district court erred in limiting Dr. Pohl's testimony as it did. The error, however, was evidentiary, not constitutional. *See* 29 Charles Alan Wright & Arthur Miller, *Fed. Prac. & Proc. Evid.* § 6286 (2d ed. 2016) (collecting cases holding

that FRE 704(b)'s exclusion of expert testimony on a defendant's state of mind in a criminal case does not "deny due process, equal protection, or the right to compulsory process") (footnotes omitted). And, as the State argues, the error was harmless. Given the substantial evidence and argument the jury heard about Matadamas-Serrano's intoxication and his incapacity to form the specific intent required for first-degree murder, there is not a reasonable probability that the limits the district court placed on Dr. Pohl's testimony affected the outcome of the trial. *See Bell v. State*, 110 Nev. 1210, 1215, 885 P.2d 1311, 1315 (1994) (holding that, in a case of evidentiary error, the test is whether "there is a reasonable probability that the witness'[s] testimony would have affected the outcome of the trial").

E.

Matadamas-Serrano argues due process, equal protection, and his right to present a defense were violated when the State provided the jury with an uncertified transcript of Aguilar's 911 call. Other courts addressing transcripts as a listening aid have allowed their use where the transcript helps the jurors follow the audio tape and precautions are taken. *See, e.g., United States v. Holton*, 116 F.3d 1536, 1541 (D.C. Cir. 1997) (describing the various procedures a district court may follow before allowing a transcript); *United States v. Howard*, 80 F.3d 1194, 1198-1200 (7th Cir. 1996) (explaining that court's preferred procedure and concluding the district court did not abuse its discretion in allowing the transcript where it reviewed portions of the tape against the transcript and properly instructed the jurors). Importantly, this transcript was not admitted into evidence, and Matadamas-Serrano points to no Nevada law regarding listening aids that would bar the district court from exercising its discretion to allow such here. Further, the record shows the district court assessed the transcript's accuracy before allowing the jury to view it, and the court

also instructed the jurors that if they detected any discrepancies between the transcript and the audio, the audio would control. *Cf.* 23A C.J.S. *Criminal Procedure and Rights of the Accused* § 1475 (2025) (explaining that courts have wide discretion in allowing written transcripts as listening aids to audiotape recordings, that one accepted procedure is for the trial court to assess the accuracy of the transcript against the recording before allowing the jury to see it, and that the court should instruct the jury that the audiotape controls in the event of any discrepancy between the two). On these facts, the district court did not abuse its discretion by allowing the jury to view the transcript while listening to the 911 call. *Cf. Howard*, 80 F.3d at 1198 (reviewing the district court's decision to permit written transcripts as a listening aid for an abuse of discretion); *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009) (reviewing evidentiary rulings for an abuse of discretion).

F.

Finally, Matadamas-Serrano contends cumulative error applies and warrants reversal. But cumulative error requires multiple errors to cumulate, and here there was only one. *See Barlow v. State*, 138 Nev. 207, 221, 507 P.3d 1185, 1199 (2022) ("Because we discern only one error, there is nothing to cumulate."). Further, even were we to credit Matadamas-Serrano's allegations of error as to the substitute coroner and Aguilar's preliminary hearing testimony, those would not tip the scale here. Cumulative error's balancing test requires us to weigh "(1) whether the issue of guilt is close, (2) the quantity and character of the error, and (3) the gravity of the crime charged." *Valdez v. State*, 124 Nev. 1172, 1195, 196 P.3d 465, 481 (2008). Though the third factor favors Matadamas-Serrano, the other two do not. As explained above, the alleged errors were insignificant when viewed in context of the other evidence presented at trial

and the purpose for which the evidence was admitted, and we conclude they would not cumulate to reversible error here. *See Pascua v. State*, 122 Nev. 1001, 1008 n.16, 145 P.3d 1031, 1035 n.16 (2006) (rejecting appellant's argument of cumulative error where the errors alleged were insignificant or nonexistent).

We therefore affirm.

_____, J.
Pickering

We concur:

_____, C.J.
Herndon

_____, J.
Parraguirre

_____, J.
Bell

_____, J.
Stiglich

_____, J.
Cadish

_____, J.
Lee